UNITED STATES of America,
Plaintiff–Appellee,

v.

Maria Del Rosario ORTIZ, Ricardo Garza, Juanita R. Garza, and Ismael Soza, Defendants–Appellants.

No. 89–6099.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1991.

Roel R. Trevino, Pharr, Tex. and Charles Louis Roberts, El Paso, Tex., for Ortiz and Soza.

Gerald H. Goldstein and Cynthia E. Hujar Orr, Goldstein, Goldstein & Hilley, San Antonio, Tex., for Ricardo Garza.

Chris Flood, Houston, Tex., for Juanita Garza.

Merv Hamburg, Atty., U.S. Dept. of Justice, Crim.Div., Appellate Section, Washington, D.C., and Paula C. Offenhauser, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before REAVLEY, POLITZ and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Four defendants appeal their convictions for various offenses arising out of a far-flung conspiracy to import and distribute marijuana. Of their five assignments of error, the one about which they most stridently complain is that the district court refused to order a new trial in the face of juror affidavits indicating that not all of the verdicts were unanimous. For the reasons that follow, we affirm.

I

This case poses complex facts, nearly all of which pertain to the ambitious drug smuggling operation underlying this appeal. For clarity and brevity, we recount only some of them, namely those necessary to a resolution of the issues discussed below.

In the mid–1980s, the defendant Ricardo Garza ("R. Garza") entered into a marijuana importation and distribution partnership with one Antonio Franco. Like many such

arrangements, theirs called for marijuana to be smuggled from Mexico into Texas and then delivered to northern cities, such as New York, Chicago, St. Louis, and Kansas City. What set this conspiracy apart was its size; to label it vast is to risk understatement. For instance, one of the enterprise's many clients—Roy Dean—purchased from it approximately a ton of marijuana every week. R. Garza himself once boasted that the enterprise handled about ten percent of all marijuana trade in the United States.

The contours of the enterprise were routine enough. In March 1985, R. Garza leased an airport in Hargill, Texas; shortly thereafter, he hired a cadre of free-lance pilots to fly empty planes to Mexico—usually Guadalajara—and to fly marijuana-laden planes back to Hargill. The pilots would then fly their cargo from Hargill to a ranch called the "checkpoint," so named because it was near a border crossing area. Once the marijuana reached the checkpoint ranch, drivers would transport it north in trucks and other vehicles, all replete with secret compartments. The drivers rarely if ever proceeded to their drop-off sites uninterrupted; as a matter of course, they would stop at houses in Houston that the enterprise either owned or rented, where the marijuana would be removed, weighed, rewrapped, and finally reloaded into the vehicles. The drivers would then resume their trip to their respective northern destinations.

Strictly speaking, however, smuggling was not R. Garza's only occupation. While engaged in the drug enterprise, he also operated a barely-if-at-all profitable automobile sales agency—Airport Auto Sales—in McAllen, Texas. Maria Del Rosario Ortiz, the secretary at R. Garza's auto agency, was his girlfriend but not his wife, that privilege being reserved for Juanita Garza ("J. Garza").[1] As for J. Garza's profession, she too ran a "legitimate" business, purchasing in early 1987 a jewelry store—also in McAllen—with funds largely obtained from R. Garza.

The enterprise used four Houston houses, two of which are of special significance. The first residence, located at 734 Turney Drive, seems to have been the most frequented. There, many if not most of the drug proceeds were stored, drivers would often receive their delivery orders, vehicles were fitted with secret compartments, and customers would occasionally pick up their contraband. The second, located at 5623 Blackjack Lane, was leased in February 1987 by R. Garza and J. Garza. It was at this residence where the marijuana cargos were unpacked, weighed, and then repacked.

In March 1987, the enterprise signed on Robert Greathouse, a driver who later became a government informant. Greathouse was introduced to R. Garza and Ismael Soza—a driver himself—at the Turney residence. Early on, Greathouse was asked only to make trips between the Turney house and the checkpoint ranch, and then only as part of a convoy that included Soza. Later, however, he assumed more responsibility, eventually making runs from the Blackjack home to customers in the north.

Just before his first of these runs, Greathouse met R. Garza, Soza, and a number of other drivers at the Blackjack Lane house. Ortiz was also present; in fact, when the topic of Greathouse's expenses arose, R. Garza asked Ortiz to get $500 from the bedroom, which she readily did. On another occasion, this one at the Turney Drive house, Greathouse saw Ortiz using a money counting machine to count a large amount of cash. According to Greathouse, many of the rooms in the residence were filled with sacks of marijuana; the kitchen, however, was stuffed with green plastic sacks that Greathouse was told contained money.

Greathouse further indicated that Soza played an instrumental role in the enterprise. He was the leader of the drivers and, as such, took charge whenever R. Garza was away. In fact, it was oftentimes Soza rather than R. Garza who gave

---

1. Although married, R. Garza and J. Garza were separated throughout the events in question.

Greathouse an itinerary and expense money.

As for J. Garza's involvement, Greathouse testified that in March 1987—shortly after purchasing the jewelry store—she appeared at the Turney Drive house carrying jewelry and offered to sell various items to Franco, R. Garza, and other organization members, including Greathouse. Also, Greathouse once saw J. Garza drive off from the Turney Drive house with a suitcase of money.

In early September 1987, law enforcement officers placed a wiretap on the telephones at the La Vista condominium in McAllen shared by R. Garza and Ortiz. When speaking over the phone about drug matters, R. Garza and Ortiz would always use code words: suppliers eager to send marijuana to the enterprise, for instance, would indicate that they wanted to send R. Garza a "family." Through this code, R. Garza arranged for myriad shipments of marijuana to be delivered to the checkpoint ranch. Many times, Ortiz relayed these orders along with other messages to members of the organization.

Later in September 1987, DEA agents searched the Hargill airport in the presence of R. Garza and several enterprise pilots. One such pilot, Robert McLean, was a government informant. Although the agents' search uncovered a bunker underneath the hangar floor that contained 2,611 pounds of marijuana, R. Garza was merely detained, not arrested.

After R. Garza was released, McLean indicated that he planned to leave town immediately and asked R. Garza for his back pay. Unaware that McLean was an informant, R. Garza agreed, made a telephone call, told McLean to go to J. Garza's house—located on Kiwi Street—and told him that she would give him his money. McLean did so, and upon arriving at J. Garza's Kiwi Street residence received from her a paper bag containing $16,200 in cash.

In November 1987 and early January 1988, law enforcement officers executed search warrants for several locations associated with R. Garza's and Franco's enterprise. At the residence on Turney Drive, agents seized, among other things, two trucks equipped with secret compartments, $10,500 in cash, a money counting machine, and several beepers. At J. Garza's Kiwi Street residence, agents found a warranty deed for five acres of land that had been sold to R. Garza, a remitter copy of a cashier's check for $1400 to Paul O'Connell (the man who had leased the airport to R. Garza), a copy of a Mexican cashier's check for $60,000, a key to a Cessna airplane, and $21,851 in cash.

At J. Garza's jewelry store, officers found a rolodex file with the Turney Drive address, a title to one of R. Garza's pickup trucks, the lease and electric bills for service at the Blackjack Lane house, a receipt for a money order used to pay for utility service at another house used by the drug enterprise, business cards identifying both Juanita and her husband as owners of the jewelry store, and accounts records showing that a number of enterprise participants were customers of the store. Other records at the store showed that it had $192,000 in available cash but disbursements of $405,000.

And at R. Garza's auto sales agency in McAllen, officers found records in Ortiz's office reflecting payouts of hundreds of thousands of dollars to drug enterprise members, including Soza.

## II

A forty-eight count indictment filed on February 16, 1989, in the United States District Court for the Southern District of Texas charged R. Garza, J. Garza, Ortiz, Soza, and a fifth defendant, Jamie Garza, with violations of federal drug, racketeering, currency transaction reporting, and money laundering laws. The four appellants pleaded not guilty with respect to each charge.

R. Garza was convicted of operating a continuing criminal enterprise, 21 U.S.C. § 848; RICO conspiracy, 18 U.S.C. § 1962(d); a RICO substantive offense, 18 U.S.C. § 1962(c); possession with intent to distribute 239 kilograms of marijuana, 21

U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 2; eight counts of possession with intent to distribute 1000 or more kilograms of marijuana, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; two counts of using the telephone to facilitate the commission of a felony, 21 U.S.C. § 843(b); five counts of money laundering, 18 U.S.C. § 1956; and transporting 200 kilograms of marijuana aboard an aircraft from Mexico to the United States, 19 U.S.C. § 1590 and 18 U.S.C. § 2. For these offenses, R. Garza was sentenced to life plus a ninety-five year term of imprisonment and was ordered to pay a $2,000,000 fine.

Ortiz was convicted of RICO conspiracy, 18 U.S.C. § 1962(d); conspiracy to possess with intent to distribute 1000 or more kilograms of marijuana, 21 U.S.C. §§ 841(a)(1), 846; and five counts of using the telephone to facilitate the commission of a felony, 21 U.S.C. § 843(b). She was sentenced to a total imprisonment term of ten years.

J. Garza was convicted of RICO conspiracy, 18 U.S.C. § 1962(d); a RICO substantive offense, 18 U.S.C. § 1962(c); conspiracy to possess with the intent to distribute more than 1000 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1), 846; and three counts of money laundering, 18 U.S.C. §§ 2, 1956. She was sentenced to ten years imprisonment.

Soza was convicted of RICO conspiracy, 18 U.S.C. § 1962(d); a RICO substantive offense, 18 U.S.C. § 1962(c); conspiracy to possess with the intent to distribute more than 1000 kilograms of marijuana, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; two counts of possession with the intent to distribute marijuana, 21 U.S.C. § 841(a)(1); and using the telephone to facilitate the commission of a felony, 21 U.S.C. § 843(b). He was sentenced to twenty years imprisonment.

### III

All told, five issues require our attention. We address them in turn.

### A

First, Ortiz, Soza, and J. Garza challenge the sufficiency of the evidence supporting their convictions. In evaluating their challenges, we must review the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the jury verdict, and then determine whether a rational trier of fact could have found beyond a reasonable doubt the essential elements of the respective offense. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Beverly,* 921 F.2d 559, 561 (5th Cir.1991).

### (1)

In forwarding her insufficiency argument, Ortiz does not deny having committed the acts which form the basis of her conviction. She insists, however, that she performed all such acts at R. Garza's request and completely unaware that he was a drug trafficking kingpin.

This argument makes little impression on us. At risk of belaboring the obvious, we have indeed held that "in drug conspiracy cases, the government must prove beyond a reasonable doubt ... that the accused knew of the conspiracy ..." *United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.1983). The evidence here, however, is more than adequate to undergird the jury's finding that Ortiz's involvement in the drug enterprise was a knowing one. The government introduced a litany of data on this point: Ortiz maintained drug trafficking records; she gave McLean, a drug-running pilot turned informer, $10,000; she was present at the Blackjack Lane residence, home to large quantities of marijuana and sacks brimming with cash; she was seen counting large sums of money; upon Garza's instructions, she gave money to Greathouse to defray his expenses during his trip north to transport marijuana; and she relayed messages and instructions to other enterprise participants, using code words no less.

Naturally, Ortiz is not without an explanation for some of these data. For instance, on those occasions where witnesses saw her counting, delivering, or retrieving large sums of money, she asserts that she

was simply playing the role of secretary to R. Garza. As for the messages she relayed to the other drug enterprise participants, she claims that she did not understand the code and, thus, never understood the messages. These explanations, however, blithely overlook the fact that we are bound at this juncture to "resolve all inferences and credibility assessments in favor of the jury verdict." *United States v. Singh*, 922 F.2d 1169, 1173 (5th Cir.1991). To make matters worse, both have only a hollow ring of truth: Ortiz's secretarial duties at Airport Auto Sales did not demand that she keep accounts for and give money to wholly unrelated concerns; and according to proof adduced by the government, even Ortiz's *housekeeper* had cracked R. Garza's primitive code.

### (2)

■ Soza's sufficiency challenge—an equally facile argument that need not keep us long—is an assertion that he was nothing more than a friend and legitimate business associate of R. Garza. The testimony of Greathouse alone is enough to support the converse inference: He indicated (1) that Soza oversaw the marijuana drivers in Garza's absence; (2) that Soza sometimes paid his expenses incurred during marijuana deliveries; (3) that Soza accompanied him on one such delivery; and (4) that Soza gathered $20,000 from inside the Turney Drive house and with it purchased a truck later used to deliver marijuana. Soza, in short, was not merely placed in "a climate of activity that reeks of something foul." *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.1983). He was a creator of that activity and its criminal smell.

### (3)

J. Garza levels her sufficiency attack against three of her six convictions: RICO, RICO conspiracy, and conspiracy to possess marijuana with intent to distribute. With respect to the RICO offenses, she argues that the evidence was inadequate to establish either that she knew of a racketeering conspiracy or that she knowingly committed racketeering acts; at most, she insists, the record reveals that she was in the presence of and associated with others engaged in racketeering activity. She takes a slightly different tack with the marijuana conspiracy, insisting that the record is bereft not only of evidence that she knew of and intended to join the conspiracy but also of proof that she was present when the conspirators undertook their conspiratorial aims.

■ Although this sufficiency challenge is more tenable than the others, ultimately it too is unpersuasive. J. Garza not only leased the Blackjack Lane stash house but also gave false information on her lease. In addition, she called one of R. Garza's pilots and told him to go to the "ranch," the place where R. Garza stashed marijuana. She visited the Turney Drive house, a residence which served no purpose but to assist the drug distribution network, and once left it with a briefcase full of money. On another visit to that house, she sold expensive jewelry to members of the drug enterprise. Upon R. Garza's instructions, after agents discovered the Hargill airport she gave the informant McLean a paper sack filled with $16,200. And a search of her Kiwi Street house revealed much in the way of incriminating evidence, such as the remitter copy of the cashier's check, the key to the Cessna airplane, and $21,851 in cash. Taken in the aggregate, these factors leave us convinced that a reasonable jury could have found the elements of the three offences beyond a reasonable doubt. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt...." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### B

The defendants insist that they are entitled to a new trial because (1) a juror had failed to inform the court that both his cousin and his sister were employees of a United States Attorney's Office, (2) the verdicts of guilt delivered on some counts of the indictment had not actually been

agreed upon, and (3) extraneous prejudicial information was brought to the attention of the jury during its deliberations.

### (1)

■ After jury deliberations had commenced, a secretary employed by the United States Attorney's Office in Brownsville, Texas approached the prosecutor and informed him that, while attending closing arguments, she had recognized one of the jurors as Jorge de la Fuente, her cousin. She further advised the prosecutor that the sister of this same juror also held a clerical position for the United States Attorney's Office, albeit in a different city. Upon learning of these facts, the district court allowed the jury to continue with its deliberations, notwithstanding the fact that de la Fuente, when asked during *voir dire* whether he had any relatives or close friends in law enforcement, had responded only that his brother served as a police sergeant in Corpus Christi.

Later, in the aftermath of the jury verdict, the trial court interviewed de la Fuente. He freely admitted that the secretary who had contacted the prosecutor was in point of fact his cousin but stated that he rarely spoke with her and that he had always believed she worked for the Customs Bureau in a position unrelated to law enforcement. When the court asked about his sister's occupation, de la Fuente volunteered that she, too, was a secretary, and that she was in the employ of the United States District Attorney's Office in Houston. When asked, however, whether he had an inkling of the purpose served by such offices, de la Fuente responded: "I don't know what they do or what their job is or anything like that." Furthermore, he professed that he and his sister had never discussed her occupation, that he had not considered her in any way related to the prosecution, and that neither her nor his cousin's vocation bore upon his impartiality during deliberations.

In *McDonough Power Equipment Co. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1985), the Supreme Court established a two-pronged test that governs this very situation. In the words of the Court, "to obtain a new trial ... a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment Co.*, 464 U.S. at 556, 104 S.Ct. at 850. We think it clear that the appellants have not so demonstrated. For starters, de la Fuente's familial ties to employees of law enforcement agencies may well not support a challenge for cause. *See Brogdon v. Butler*, 838 F.2d 776, 778 n. 1 (5th Cir.1988); *Sudds v. Maggio*, 696 F.2d 415, 416–417 (5th Cir.1983). Moreover—and much more important—de la Fuente's post-verdict dialogue with the district court suggests that he answered the voir dire query honestly yet inaccurately, something *McDonough Power Equipment Co.* expressly permits. *Id.* 464 U.S. at 555, 104 S.Ct. at 849–50 ("To invalidate the result of a 3–week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.... The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial").

### (2)

After the jury returned its verdict on July 28, 1989, the court polled each juror four times, once for each defendant; each time, each juror affirmed that the verdict was his. Nevertheless, three days later, juror Thelma Reid phoned the district court's staff to express her concern about "improprieties" that had taken place during the jury's deliberations. Having secured the services of a court reporter, the court returned Reid's call, whereupon Reid claimed, among other things, that on several counts she had never agreed to return a guilty verdict. She stated that two other jurors, Gloria Reyes and Emma Aguilar, shared her concerns and would soon be in contact with the court. Rather than await these calls, however, the court seized the initiative and called Reyes, who echoed

Reid's complaint that the verdict rendered in open court was not her own.

Following its talk with Reyes, the court informed the attorneys of the jurors' misgivings and gave the appellants leave to speak with the jurors outside of its presence. Armed with the court's blessing, the appellants soon acquired affidavits from Reid, Reyes, and Aguilar uniformly averring that many of the guilty verdicts were simply the unilateral handiwork of the foreperson, Inocencia Gomez.[2] These affida-

2. The text of the three affidavits—with emphases and errors as in the originals—follows:

| STATE OF TEXAS | § | |
| | § | AFFIDAVIT |
| COUNTY OF WILLACY | § | |

BEFORE ME, the undersigned authority, on this day personally appeared Emma Aguilar, who, after being duly sworn by me upon her oath deposed and said:

"My name is Emma Aguilar, I reside at 888 North Bonham, San Benito, Texas. I was a juror in cause number B–89–68, the United States of America v. Ricardo Garza, Ismael Sosa, Maria Del Rosario Ortiz and Juanita R. Garza.

"I would like to bring to light some events that occurred during the trial and jury deliberations that I believe are inconsistent with the instructions given to the jury by the court. Also, I feel the Court should know that I was not being truthful when asked if the verdict reflected my findings.

"The final verdict was not my verdict. The jury never unanimously voted to convict the Defendants on the courts they were convicted on.

"Also, the jury was given clear and specific instructions not to discuss the case in any way whatsoever at any time at all, prior to jury deliberation. However, I would like to point out that these instructions were disregarded by a juror on the first day of the trial on our way to lunch. She mentioned that she believed all the people on trial were guilty.

"Second, the jury was given instructions to consider the evidence on *each* count presented against *each* defendant. This procedure was not followed during the jury's deliberations. I was told that they were all guilty from the outset, and the foreperson stated we were to consider the case as a whole and not to vote on the individual counts as presented in court. Three of us jurors strongly disagreed with this procedure of voting and asked the jury foreman on various and numerous occasions to seek clarification of this procedure so we could proceed as previously instructed. She refused to send a question to the Judge about the voting procedures. Since we were denied access to Judge F. Vela we were compelled to follow the foreman's procedures.

"At one point, in Mr. Ricardo Garza's case, we got to vote only on four counts, but later the decision was disregarded and the votes erased. When we first voted on Ismael Soza we found him not guilty on all counts and then later without any additional vote the foreperson changed it to guilty. Also, when we first voted on Juanita R. Garza we voted unanimously to acquit her of all counts except for one. When we were going back through Friday morning, I was told that if we found her guilty of any of them we had to find her guilty of all of the racketeering and conspiracy counts. No vote was ever taken to change our verdict on those counts but the foreperson changed the Not Guilty findings to Guilty without our consent. I never voted guilty to any more than one count against Juanita R. Garza. Also, when we first voted on Rosie Ortiz we voted Not Guilty on all of the counts except one. Those Not Guilty findings were also erased and changed by the foreperson or the blond woman who sat on the front row.

"Finally, *the verdict that was read in court was never my verdict,* and *I never voted in accordance with that verdict.* When I was asked by the Judge if it was my verdict I only answered yes because the others had and because I was afraid of what the court might do to me if I didn't. I don't think the Defendants got a fair trial and I hope that by informing the Court of this misconduct it will help to serve justice.

/Emma Aguilar/
EMMA AGUILAR

\*  \*  \*  \*  \*  \*

| STATE OF TEXAS | § | |
| | § | AFFIDAVIT |
| COUNTY OF WILLACY | § | |

BEFORE ME, the undersigned authority, on this day personally appeared Gloria Ann Reyes, who, after being duly sworn by me upon her oath deposed and said:

"My name is Gloria Ann Reyes, I reside at Route 2, Box 170, Raymondville, Texas. I was a juror in the case of the United States of America vs. Ricardo Garza, et al, Cause No. B–89–68, before the Honorable Judge Filemon Vela.

"I am giving this affidavit of my own free will, I am of sound mind and am not under any threat or duress.

"I wish to state that the Defendants in this case were denied a trial and verdict by a unanimous jury.

"At no time during the deliberations did the jury unanimously vote to convict Ricardo Garza, Juanita R. Garza, Maria del Rosario Ortiz or Ismael Sosa and at no time during the deliberations did I vote for a guilty verdict as to Ricardo Garza or any of the

Note 2—Continued

other defendants in this case nor did I assent to such a verdict. In fact, at no time during the deliberations was there a vote taken on the guilt or innocence of Ricardo Garza.

"At the time we were polled by the court I lied about that being my true verdict because I was intimidated by the courtroom atmosphere, and power of the Government and fear of being ridiculed by the Judge. "During the trial and deliberations there were certain other matters that I feel should be brought to the attention of the Court that I feel are inconsistent with my understanding of the term "Trial by Jury."

"On the third day of trial on our way to lunch, even though the jury had been given clear and specific instructions not to discuss the case in any way nor make independent investigations, one of the jurors stated that she knew one of the individuals mentioned during the trial, Otto Chacon, and that she knew he was a drug dealer and that the people on trial were guilty. Another juror commented that she had driven by "La Vista Apartments" during the course of the trial and they appeared to be very expensive condominiums not cheap apartments and where was the money coming from to pay for these very expensive condos.

"On the first day of deliberations, as soon as we were in the jury room, the jury foreman took the verdict forms. Starting on Ricardo Garza's form she read the first count and stated "guilty" right everyone?, without discussing the facts or the evidence. She proceeded to do the same on the next 2 counts until I said "No, wait a minute that is not what the Judge instructed, I understood we are supposed to weigh the evidence and vote on each count and each defendant." "I was then told by juror Jorge De La Fuente that I was narrow-minded and that I was supposed to look at the whole case as an umbrella. I then asked "do you mean everyone is guilty" and the foreman said "Yes."

"Wednesday's deliberations ended with the foreman's entering 3 counts of guilty on Ricardo Garza without a vote ever being taken. I did not agree to this and told them so.

"On Thursday, we came back and began arguing on Ricardo's counts. The foreman then said "lets put Ricardo aside" and went on to Ismael Sosa. The foreman stated that Ismael Sosa was never caught with any marijuana and I said he was not even at the airport. I then asked her to ask the Judge if each count and each defendant was to be taken individually and she refused. I wanted it clear as to whether we should consider each count and each defendant separately. The foreman then said "we will go by each count but you know that Ricardo is guilty." I said "No, I don't know that Ricardo is guilty." I want to consider each count and

I want to read it." I did not feel there was enough evidence to vote guilty on all counts so I refused to vote Guilty or assent to a Guilty verdict.

"Ismael Sosa was then set aside and the foreman entered a guilty verdict on all counts even though a vote was never taken. "After discussions on Juanita we unanimously voted "not guilty" with the except of one count.

"On Friday, I again stated I was not changing my mind about not voting guilty without taking each count individually and for each defendant. I also requested clarification on the term "racketeering." We were told to read our instructions. Jorge De La Fuente then read the instructions and told me to look at the case like an umbrella. The foreman said that the women would get probation, but that we were forced to find them guilty of racketeering since they were guilty of other things.

"The blond woman then took the forms from the foremen and told her she had done them wrong and changed the not guilty findings to guilty.

"The foreman and the lady that works for GMAC then wrote guilty on the remaining counts on Ricardo Garza. No vote was taken and that was never my verdict.

"When we were polled I stated it was my true verdict but only because I felt intimidated and that I might be subject to legal proceedings and ridiculed by the Judge.

"I have made this statement because I realize that in this case justice was not served because of blatant manipulation of jury deliberation procedures.

/Gloria Ann Reyes/
GLORIA ANN REYES

\* \* \* \* \* \*

STATE OF TEXAS §
§ AFFIDAVIT
COUNTY OF CAMERON §

BEFORE ME, the undersigned authority, on this day personally appeared Thelma Reid, who, after being duly sworn by me upon her oath deposed and said:

"My name is Thelma Reid. I currently reside at 127 Highland Drive, Brownsville, Texas. I recently participated as a juror in Cause No. B–89–68, United States of America v. Ricardo Garza, Ismael Sosa, Maria del Rosario Ortiz and Juanita R. Garza.

"I am making this statement of my own free will for the sole purpose of informing all parties of events that occurred during the trial which I believe were improper.

"*The verdict read in court is not my verdict.* The jury never unanimously voted to convict Ricardo Garza, Ismael Sosa, Maria del Rosario Ortiz and Juanita R. Garza as the verdict read in court indicated.

"Also, during the trial the court repeatedly instructed the jury to consider only the evidence presented on *each* count as applied to *each* defendant. However, in our deliberations we failed to follow this instruction.

vits, in turn, were incorporated into the appellants' respective motions for a new trial, filed in August of 1989.

Upon reviewing the affidavits, the district court conducted some investigation of its own. First, on September 19, 1989, it interviewed Gomez. Her account of the deliberative process stood in flat contradiction with the affiants': According to her, a vote using written ballots was taken on each count as to each defendant; and before the word "guilty" was written on the verdict form, she received a ballot from each juror on which the word "guilty" had been written. Later, the court interviewed Reyes, who continued to insist that some guilty verdicts were rendered without a vote, much less unanimity. Lastly, the court called a juror chosen at random—Lita Ortiz—who sided with Gomez by indicating that the jurors had individually voted on each defendant and each count.

■ Its inquiry finished, the trial court on September 27, 1989, entered an order rejecting the appellants' challenge to the verdict and denying their respective pleas for a new trial. The order succinctly expressed why: "The vast majority of the ... conversations with jurors and the affidavits of jurors fall squarely within the ambit of Federal Rule of Evidence 606(b)," which "under the facts of this case ... bars any inquiry into the unanimity of the jury's verdict."

We concur. Federal Rule of Evidence 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith*, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

We never voted on each count and never voted on each defendant in each count. Three of us strongly disagreed with the voting procedures that were being used and one juror repeatedly asked the foreperson to send a question to the Judge for clarification on his instruction regarding voting. However, the foreperson refused to send the question to the Court. There were some counts that the foreperson wrote in the word 'guilty' to reflect our findings when we had actually never voted on that count. "On one occasion we voted unanimously to acquit the defendant Juanita Garza of all racketeering counts and conspiracy counts. Afterwards a question was sent to the court requesting the definition for racketeering and the elements necessary to find a defendant guilty of racketeering. The court's answer was read to us by the foreperson. No other vote was ever taken as to Juanita Garza on those counts but the foreperson erased our finding of 'not guilty' and changed it to 'guilty.' If there had been a subsequent vote and if there were now a vote, I would vote 'not guilty' on those counts. When the foreperson changed our verdict I objected but was told not to worry because Janie would get probation anyway. I never withdrew my objection and still believe she is not guilty.
"Similar incidents occurred when voting on allegations against Maria del Rosario Ortiz and Ismael Sosa. Also, when we were voting on the charges against Ricardo Garza we only voted on four counts and did not vote on all counts that the verdict reflected a guilty finding on.
"Finally, and most importantly, when the verdict was read in court, it did not reflect my verdict and I never intended what was read in court as ever being my verdict. When asked by the court, I hesitantly shook my head yes but that was only out of fright and intimidation. I was afraid that I might be subject to some legal penalty if I was to tell the court the truth.
"I make this statement now because I truly believe that I have not upheld my oath as a juror. When I was first sworn I promised that a true verdict I would render based upon the law and evidence in this case. By not telling the court that the verdict that was read was not my verdict, I have violated my oath."

/Thelma Reid/
THELMA REID

\* \* \* \* \* \*

(Emphasis added.) We note that the rule separately bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.

The Rule proscribes the post-trial testimony on which the defendants' motions rest. In their attempt to retract their earlier verdicts personally delivered in open court, Reyes and Aguilar impermissibly seek to "testify as to any matter or statement occurring during the course of the jury's deliberations ..." Indeed, the Advisory Committee notes accompanying 606(b) single out voting as such a "component of deliberation."

The defendants seek to squeeze the instant case into two putative Rule 606(b) exceptions. We have allowed post-trial juror testimony when the evidence was of a clerical error in the verdict, *see United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987), or that no verdict was reached, *see Fox v. United States*, 417 F.2d 84 (5th Cir.1969).

In certain circumstances, the *Fox* exception may allow the court to consider jurors' statements to determine whether a verdict was in fact reached. The exception, however, is not so broad as to allow a juror to contradict four earlier statements made by that juror in open court, which unequivocally expressed agreement with the verdict. With respect to the remaining statements, they are expressly barred by the rule. These are statements concerning the testifying jurors' own states of mind, or the states of mind of other jurors, or the process of their deliberations.

### (3)

Although the district court was correct to observe that a juror's testimony regarding deliberative matters usually falls squarely within the ambit of Rule 606(b), juror testimony concerning prejudicial extraneous information is a horse of another hue. The rule expressly provides that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention." Fed.R.Evid. 606(b). Not only that, we have previously held that when such materials find their way into the jury room, a defendant "is entitled to a new trial unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *Llewellyn v. Stynchcombe*, 609 F.2d 194, 195 (5th Cir. 1980).

The appellants cite three incidents that they contend implicate the rule in *Llewellyn*. First, one of the jurors—Reyes—mentioned that she had driven by an airport in Hargill, that she had been unable to see over the fence surrounding the airport, and that she was therefore uncertain whether it was the airport R. Garza had leased. The other two incidents are described in Reyes's affidavit:

> On the third day of trial on our way to lunch, even though the jury had been given clear and specific instructions not to discuss the case in any way nor make independent investigations, one of the jurors stated that she knew one of the individuals mentioned during the trial, Otto Chacon, and that she knew he was a drug dealer and that the people on trial were guilty. Another juror commented that she had driven by "La Vista Apartments" during the course of the trial and they appeared to be very expensive condominiums not cheap apartments and where was the money coming from to pay for these very expensive condos.

The district court rejected the appellants' argument that these three episodes warranted a new trial, concluding that there was no reasonable possibility that any of the extrinsic information prejudiced the defendants. We are to uphold the refusal to grant a new trial absent an abuse of discretion. *McDonough Power Equipment Co.*, 464 U.S. at 556, 104 S.Ct. at 850. Again, we find no such abuse. In coming to its holding, the court below made the following findings, all of which we deem perfectly proper: Reyes's drive-by of the Hargill airport was incidental—she had

come upon the field fortuitously—she was not even sure that it was the correct airport, and she brought up her drive-by before deliberations began. As Reyes suggested in an *in camera* interview, the La Vista drive-by occurred prior to trial; thus, it too did not constitute a juror investigation. Additionally, in that same *in camera* exchange, Reyes indicated that the juror who had seen the apartments mentioned only that the apartments looked quite expensive, nothing more. And there is no indication that the reference to Chacon was either brought up during or had an influence on deliberations. Furthermore, the prosecution's case-in-chief contained evidence of Chacon's relationship to the drug enterprise, thus giving the defense some opportunity to contradict the assertion that Chacon was a drug dealer and placing the instant case on footing different from *United States v. Howard,* 506 F.2d 865 (5th Cir.1975).

### C

■■■■ Less than a week before trial and on the eve of juror selection, J. Garza moved to sever her trial from R. Garza's on the ground that her husband would agree to testify on her behalf if tried separately. In a sealed affidavit prepared by R. Garza and attached to J. Garza's motion, he stated that he "would be willing to testify at [J. Garza's] subsequent trial" and, further, that he "would be able to exculpate her...." Specifically, were the motion granted, R. Garza averred that he "would testify" that "a large amount" of the $260,000 involved in the laundering scheme charged in count forty-three was actually consigned to him in the form of precious stones. With respect to count forty-four—charging the Garzas with laundering approximately $2,568—he stated that, "in the event my wife is severed from trial and I was to testify, I would in fact testify that the $2,568 was given to my wife by me and she had no knowledge of the origination of the funds." The district court denied the motion, a decision J. Garza now assigns as error. We review the failure to grant such

a motion for abuse of discretion. *United States v. Bolts,* 558 F.2d 316, 322 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977).

We dismiss this argument for two reasons. First, irrespective of whether the court below was within its rights to refuse the severance request, J. Garza has not shown the quantum of harm necessary for reversal. "In order to demonstrate abuse of discretion, the defendant bears a heavy burden of establishing *compelling prejudice.*" *United States v. Salomon,* 609 F.2d 1172, 1175 (5th Cir.1980) (emphasis added). *See also United States v. Mota,* 598 F.2d 995, 1000 (5th Cir.1979) ("The test in this circuit for reviewing the denial of a severance is that the defendant must be unable to obtain a fair trial without a severance and must demonstrate compelling prejudice against which the trial court will be unable to afford protection"). For all her attention to the issue of whether the district court was wrong to deny her a separate trial, J. Garza has all but ignored the question of whether that denial deprived her of a fair trial and effected compelling, incurable prejudice.

Second and more importantly, however, we are convinced that the district court did not abuse its discretion in denying J. Garza's request. A defendant seeking a severance on the ground that she needs the testimony of a co-defendant must demonstrate (1) a bona fide need for the testimony; (2) the substance of the expected testimony; (3) its exculpatory nature and effect; and (4) that the designated co-defendant will in fact testify. *United States v. Grapp,* 653 F.2d 189 (5th Cir.1981); *see* Fed.R.Crim.P. 14. The trial court, after citing these criteria, concluded that, although J. Garza had made a prima facie showing of need and substance, as well as of the exculpatory nature of the testimony with regard to count forty-four, she had failed to prove that R. Garza's testimony would be exculpatory with regard to count forty-three, this because he promised to account for only a "large amount" of the laundered proceeds, not the full amount. It also noted that J. Garza's agreement to

testify was at places equivocal,[3] that the exculpatory value of the testimony was not high enough to overcome the need for judicial economy, that the affidavit was exculpatory as to only two of the seven charges lodged against her, and that the affidavit was filed at the eleventh hour. In the light of this confluence of findings, we unequivocally hold that there was no abuse of discretion.

### D

■ Count five of the indictment charged R. Garza with possessing marijuana on January 11, 1986, at the apartment of one Hector Palacious. At the close of the government's case-in-chief, the court dismissed this count on the ground that no evidence had been presented in support of the underlying charge. *See* Fed.R.Crim.P. 29(a). Subsequently, in the course of presenting his defense, R. Garza adduced testimony that evidence from the Hargill airstrip—a walkie-talkie, a radio, various papers—was not but could have been checked for fingerprints. This testimony, argued R. Garza, meant that the jury was entitled to believe that he had nothing at all to do with the evidence seized at Hargill.

To rebut this argument, the government introduced evidence—primarily a cellular telephone and scales—discovered during a search of Palacious's apartment that could have been used to support a conviction on the already-dismissed count five. R. Garza argues that district court erred in admitting this evidence over his objection, that it compounded its error by giving the jury confusing instructions regarding the use of the evidence, and finally, considering that he had already won a dismissal of count five, that the admission of this evidence contravened the constitutional proscription on double jeopardy under the Supreme Court's holding in *Grady v. Corbin,* —

U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

We disagree. In the first place, R. Garza's reliance on *Grady* is misplaced. That case instructs that a subsequent prosecution is barred "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Grady,* 110 S.Ct. at 2087 (1990). Here, by contrast, there has been no subsequent prosecution and hence no breach of the *Grady* standard. *United States v. Devine,* 934 F.2d 1325, 1343–45 (5th Cir.1991).

R. Garza's remaining two complaints are equally skewed. The trial court's decision to admit the rebuttal evidence was a proper exercise of its broad discretion in matters of this kind. *See United States v. Dotson,* 799 F.2d 189, 194 (5th Cir.1986); *United States v. Renfro,* 620 F.2d 497, 502 (5th Cir.1980). Read as a whole, its instructions—which in relevant part admonished the jury to use the effects found at Palacious's apartment for rebuttal purposes only—were "comprehensive, balanced, fundamentally accurate ... not likely to confuse or mislead" and hence adequate. *Scheib v. Williams–McWilliams Co.,* 628 F.2d 509, 511 (5th Cir.1980). And in any event, given the overwhelming weight of the evidence against R. Garza, any evidentiary error associated with the admission of the rebuttal evidence was by all measures harmless. *Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).[4]

### E

Finally, Ortiz argues that the district court erred in denying her bail pending her appeal. Because we affirm Ortiz's convictions, however, this issue is moot. *See*

3. Although J. Garza did make one unequivocal promise—he indicated that he *"would testify* that a large amount of [the $260,000 at issue in count forty-three was] in fact received by me in the form of precious stones and held by me on consignment"—he at times hedged, avowing only that he *"would be willing to testify* at [J. Garza's] subsequent trial" and that *"[i]n the event ... I was to testify,* I would in fact testify that the $2,568 was given to my wife by me and

she had no knowledge of the origination of the funds" (emphases added).

4. In a motion filed October 11, 1990, Ortiz adopted the sections of R. Garza's brief devoted to this issue. *See* Fed.R.App.P. 28(i). This maneuver, while puzzling, is futile, for any error in the admission of the count five evidence is assuredly harmless as concerns Ortiz.

*United States v. Williams,* 822 F.2d 512, 517 (5th Cir.1987).

### IV

For the foregoing reasons, the judgment of the district court is

AFFIRMED.