5/20/97

IN THE COURT OF APPEALS

OF THE

STATE OF MISSISSIPPI

NO. 95-KA-00841 COA

CHARLIE CAUTHEN, A/K/A "TOOTHPICK" A/K/A CHARLIE EVERETTE CAUTHEN, JR.

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. ANDREW CLEVELAND BAKER

COURT FROM WHICH APPEALED: CIRCUIT COURT OF PANOLA COUNTY

ATTORNEY FOR APPELLANT:

DAVID L. WALKER

ATTORNEY FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY: CHARLES W. MARIS, JR.DISTRICT ATTORNEY: JOHN W. CHAMPION

NATURE OF THE CASE: CRIMINAL

TRIAL COURT DISPOSITION: CONVICTION OF SALE OF COCAINE AND SENTENCE OF 12 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH 5 YEARS SUSPENDED, $1000 FINE

MOTION FOR REHEARING FILED:6/2/97

CERTIORARI FILED: 12/15/97

MANDATE ISSUED: 4/1/98

BEFORE BRIDGES, C.J., HERRING, AND PAYNE, JJ.

HERRING, J., FOR THE COURT:

The Appellant, Charlie "Toothpick" Cauthen, was indicted and convicted for the sale of cocaine. The trial court sentenced Cauthen to twelve years in the custody of the Mississippi Department of Corrections, with five years suspended pending good behavior. Additionally, Cauthen was ordered to pay a one thousand-dollar fine, a laboratory analysis fee of one hundred twenty-five dollars, as well as seventy-five dollars in restitution to the Panola-Tate Narcotics Task Force. The trial court denied Cauthen's post trial motions for a new trial and a judgment notwithstanding the verdict, and Cauthen now appeals. Having considered the claims of the Appellant and finding they have no merit, we affirm.

FACTS

On May 11, 1994, David Smith, acting as a confidential informant for the Panola-Tate Narcotics Task Force, was picked up by Agent Kathleen Hoyt and Agent David Kirkland near his home in Batesville, Mississippi. Smith, the brother-in-law of Appellant, Charlie "Toothpick" Cauthen, was working with the task force to earn money for "bad" checks he had written. Smith was then taken by the agents to the Panola-Tate Narcotics Task Force office where he was searched and wired. While at the task force office, Smith was informed that he would be assisting Agent Hoyt in buying narcotics from Cauthen. Thereafter, Agent Hoyt and Smith left the office and traveled to Wood Street in Batesville, Mississippi, where Agent Hoyt parked her automobile near King's Cafe. Smith exited the vehicle and found Charlie Cauthen standing near a laundromat on the street. Smith testified that Cauthen questioned him about the woman in the vehicle in which he was riding, and Smith responded that she was a friend, indicating to Cauthen that she was not a police officer. Thereafter, Smith asked Cauthen if he could purchase three rocks of crack cocaine for his friend in the automobile. Cauthen informed Smith that the cost would be fifty-five dollars. Smith then went to the vehicle and reported to Agent Hoyt that the cost of the cocaine would be fifty-five dollars, and she informed Smith that she would only pay fifty dollars. Smith took the fifty dollars to Cauthen and told him that his friend could only pay Cauthen fifty dollars for the cocaine. According to Smith, Cauthen accepted the money from him and gave Smith three rocks of crack-cocaine, which he put into his pants pocket.

Cauthen was later arrested and indicted for the sale of cocaine. At the subsequent trial, Cauthen was convicted for the illegal sale of narcotics and, as stated, was sentenced to twelve years in the custody of the Mississippi Department of Corrections with five years suspended pending his good behavior. Cauthen was also ordered to pay a fine of one thousand dollars and other restitution.

One of the issues in this case involves the failure of a juror to answer questions asked during voir dire investigation. Therefore, it is important to analyze the pertinent facts surrounding that investigation. During the trial court's voir dire examination of the members of the venire panel, the following statements were made:

THE COURT: Mr. Walker, would you now introduce the defendant to the jury and give the jury the

benefit of where he lives and let me ask some questions along that line. You can do it or let him do it himself.

MR. WALKER: Your, Honor, this is Charles Cauthen. He goes by the nickname sometimes of "Toothpick," I think, and he lives in Courtland, Mississippi.

. . .

BY THE COURT:

Q. Are any of you related by blood or marriage to Charlie Cauthen? He spells the last name C-a-u-t-h-e-n. He's got a nickname of Toothpick. Are any of you related by blood or marriage to him?

Yes, ma'am, you identified yourself, Ms. Sullivan. Stand up, please. I'm afraid I'll miss a hand. Your number?

A. (Mr. Robert D. Hentz) 148.

Q. You're Robert D. Hentz?

A. Correct.

Q. And you are related by blood or marriage?

A. Blood. That's my uncle's son.

Q. Mr. Hentz, you will not need to respond to any additional questions.

A. Yes, Sir.

(Ms. Linda F. Hill) 233.

Q. No. 233, you're Linda F. Hill?

A. Yes, sir.

Q. Are you related to Mr. Cauthen by blood or marriage?

A. Blood.

Q. You will not need to respond to any other questions. Anyone else?

A. (No response.)

Q. How many of you know Mr. Cauthen, just know who he is when you see

him?

Just stand up. I want to ask kind of a blanket question and give all of you a chance to respond.

Some of you probably went to school with him. Some of you probably live in the neighborhood with him. Some of you may have worked with Mr. Cauthen. When you live in small towns like Batesville,

Courtland or Charleston, you know a lot of people, you're supposed to, and you mix and mingle with people. What I've got to determine this morning is whether any of you have a personal situation that might affect your ability to be fair and impartial in this trial. Some of you may not like Mr. Cauthen. Some of you may be extremely close friends. So I've just got to leave it up to you to identify to us what your particular situation is.

Thereafter, numerous members of the panel spoke out and stated that they knew Cauthen or members of his family. Some stated that their relationship to him would affect their ability to render a fair and impartial verdict. Others felt that their ability to render a fair verdict would not be impaired by their relationship with Cauthen.

Later, an additional voir dire examination of the members of the panel was conducted by the prosecutor:

Q. All right. I'm going to ask you again: Do any of you out there now that you've had a little time to think about it know his family or know this defendant and you have not responded yet?

A. (No response).

After further voir dire of prospective jurors who had previously acknowledged a relationship with Cauthen, the prosecutor finally stated:

Q. . . . Nobody else out there knows this defendant or his family?

A. (No response).

At the close of the trial after both sides had rested, after written instructions had been issued to the jury that was ultimately selected, and after closing arguments had been completed, the jury retired to the jury room to begin its deliberations. Approximately one and one-half hours later and just before the noon recess, a jury spokesperson passed a note to the bailiff with instructions that it be given to the trial judge. This note, which was delivered by the bailiff to the judge stated:

Judge Baker, as spokesperson for the jury, I feel that I am duty bound to make you aware of certain facts in the deliberations. One juror has stated that he has a close relative called Toothpick, who is a drug dealer. The juror is Mr. Emmit Shegog. He is in the minority. I will not say what that is. Did he make this fact known during jury selection.

Thereafter, the trial judge called the jury into the courtroom, gave them instructions to follow during the noon recess, and allowed them to disperse during the noon hour. At approximately 1:30 p.m., the jury returned and resumed their deliberations.

At 2:35 p.m., the trial court once again seated the jury in the jury box, and the following exchange took place:

THE COURT: I was advised earlier around noon that the jury was in a deadlocked position. We took the noon recess, and I asked the jury to come back at 1:30 and begin work, and you've been back at work for about another an hour.

Mr. Ross, I'll ask you to be the spokesperson for the jury. Is the jury still in a deadlocked situation?

JUROR ROSS: Your, Honor, we are making progress at this time, I feel.

THE COURT: I'm glad to hear that, and I will let you go back to work.

JUROR ROSS: All right.

THE COURT: I guess I could have come to the jury door and asked the same question, but it's better to hear it in the courtroom, I guess, where everybody involved can hear it.

JUROR ROSS: There's no guarantee of a verdict, but we are making progress.

THE COURT: I understand that. If you think some progress is being made, then let's go back to work. I've got other things I can be doing.

JUROR ROSS: Judge, Baker, could I ask you one thing before we go back?

THE COURT: Yes, sir.

JUROR ROSS: We had a question in the jury room that we sent you on a yellow piece of paper.

THE COURT: Yes, sir, I've got the question here somewhere, and I'll get around to trying to answer that for you.

JUROR ROSS: All right. Thank you, sir.

(THE JURY RETIRED TO THE JURY ROOM AT 2:37 P.M.)

It was apparently during this exchange that counsel for both the State and Cauthen were informed that the note mentioning Juror Shegog had been passed from the jury to the judge. Immediately following the jury's return to the jury room, the judge called for a bench conference with the attorneys. After the bench conference (which was not transcribed or made a part of the record), the following dialogue took place between the attorney for Cauthen and the trial court:

MR. WALKER: Judge, I don't have any problem with this, but I would simply suggest to the Court that we probably ought to make a record on this.

THE COURT: The clerk will keep all of this for the file.

MR. WALKER: That's fine.

THE COURT: Would you hand this to the jury, please.

(A NOTE WAS PASSED FROM THE COURT TO THE BAILIFF.)

Neither this note from the judge to the jury nor its contents was made a part of the record in this action. Thus, we have no way of knowing what the note stated. We do know, however, that counsel for Cauthen was apparently satisfied at this point with the action taken by the trial court in communicating with the jury, since counsel specifically stated, "Judge, I don't have any problem with this . . . ."

The next instance in which the issue of the notes was discussed on the record was during Cauthen's sentencing hearing, at which time Cauthen's post trial motion for new trial was also heard. In his argument for a new trial, Cauthen's attorney stated "[t]hat the integrity of the verdict was in doubt because of the comment by Juror Shegog to other jurors as reflected in the jury foremen's ex- parte note to the trial judge that he has a close relative known as 'Toothpick' who is a drug dealer and the Defendant should therefore be granted a new trial." At this hearing, defense counsel also commented:

MR. WALKER: I hope the Court remembers that I think at one time the Court in its mind considered the issue of whether a mistrial should be entered in this case, and perhaps the district attorney's office conducted investigation into the facts and circumstances alluded to here today, so based upon those facts, Your Honor, I think the integrity of the jury perhaps might be subject to doubt.

Thereafter, the trial court issued its ruling denying Cauthen's motion and stated:

THE COURT: I'm not going to disturb the jury verdict. I think the key wording in this case that Mr. Walker had furnished me to review --. . . . I don't recall the name, but on page 558 in the right-hand column, the first full paragraph, former Justice Jimmy Rober[t]son writing for the Court, I believe -- yes, sir. 'Following a jury verdict where a party shows that a juror withheld substantial information or misrepresented material facts and where a full and complete response would have provided a valid basis for a challenge for cause, the trial court must grant a new trial, and failing that, we must reverse on appeal.'

We fall far short of that here. As a matter of fact, it's no evidence before me that Juror Emmit Shegog was related to this defendant. He was asked that question. He did not respond to it. The note from the bailiff -- from the juror to the clerk to me certainly does not establish that as, again, substantial information withheld or that he misrepresented material facts. So I'm satisfied that I should not disturb the jury verdict on that assignment.

The note from the jury to the trial court referring to Juror Shegog was duly marked and made a part of the record of this proceeding. However, the note in response from the trial court to the jury is not part of the record, nor is there any further explanation of Juror Shegog's statement to other jurors during deliberations concerning his close relative named Toothpick, who was a drug dealer. *At no time did Cauthen object or move for a mistrial while the jury was deliberating.*

## ISSUES

On appeal, Cauthen raises the following issues:

I. WHETHER CAUTHEN IS ENTITLED TO A NEW TRIAL BECAUSE JUROR SHEGOG TOLD FELLOW JURORS THAT HE HAS A CLOSE RELATIVE CALLED "TOOTHPICK" WHO IS A DRUG DEALER AND FAILED TO DISCLOSE THIS INFORMATION DURING VOIR DIRE OF THE VENIRE, IN VIOLATION OF SECTION 13-5-67 OF THE MISSISSIPPI CODE?

II. WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO GRANT CAUTHEN'S ENTRAPMENT INSTRUCTION?

III. WHETHER THE VERDICT OF THE JURY OF GUILTY WAS AGAINST THE

OVERWHELMING WEIGHT OF THE EVIDENCE?

ANALYSIS

I. WHETHER CAUTHEN IS ENTITLED TO A NEW TRIAL BECAUSE JUROR SHEGOG TOLD FELLOW JURORS THAT HE HAS A CLOSE RELATIVE CALLED "TOOTHPICK" WHO IS A DRUG DEALER AND FAILED TO DISCLOSE THIS INFORMATION DURING VOIR DIRE OF THE VENIRE, IN VIOLATION OF SECTION 13-5-67 OF THE MISSISSIPPI CODE?

A. Standard of Review.

A motion for a new trial challenges the weight of the evidence and should not be granted except to prevent an unconscionable injustice. Moreover, we will reverse a conviction on a motion for new trial only for abuse of discretion and, on review, will accept as true all evidence favorable to the State. *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993); *Wetz v. State*, 503 So. 2d 803, 807-808 (Miss. 1987). Furthermore, a jury verdict will not be vacated "unless . . . the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Robinson v. State*, 566 So. 2d 1240, 1242 (Miss. 1990) (quoting *Groseclose v. State*, 440 So 2d 297, 300 (Miss. 1983)). Thus, the issue before us on this assignment of error is (1) whether the trial court abused its discretion when it denied the motion for new trial, and (2) whether allowing the jury verdict to stand would be to sanction an unconscionable injustice. We find that the trial court did not abuse its discretion and that the verdict in this case did not result in unconscionable injustice, since the Appellant failed to object to the jury completing its deliberations and failed to move for a mistrial.

Cauthen contends that the trial court erred in overruling his motion for new trial, based upon the failure of Juror Shegog to respond to the questions asked during the voir dire examinations of the panel. Both the trial court and the prosecutor asked the prospective jurors if they were related to Cauthen, and that he went by the name of "Toothpick." Although numerous jurors spoke out concerning their relationship with Cauthen, Juror Shegog did not respond and remained silent. Only after Shegog had been chosen to serve and only after the jurors in this case had retired to begin deliberations on the guilt or innocence of Cauthen, did Shegog decide to make it known to his fellow jurors that he did, after all, have a close relative named Toothpick, who was a drug dealer. This information was passed on to the trial court through a jury spokesperson who received a written response from the judge which was not made a part of the record, but was agreed to by counsel for Cauthen. In his motion for new trial, Cauthen argues, based on the foregoing undisputed facts, that the integrity of the jury is "in doubt," and by implication, that Shegog's lack of candor made it impossible for Cauthen to intelligently exercise his challenges to the jury panel, either for cause or peremptorily, in violation of Miss. Code Ann. 13-5-69 (Supp. 1996).

It is probable that the failure of Shegog to respond to the inquiry on voir dire clearly and adversely affected Cauthen's right to challenge Shegog for cause or peremptorily. As stated in *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978):

The failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause.

Indeed, the examining attorney has only a limited number of peremptory challenges. The lack of vital information as to one juror can materially affect his decision as to whether other jurors should be challenged.

Faced with this situation, we must determine whether Cauthen was unduly prejudiced by Shegog's failure to disclose significant information which he later disclosed to his fellow jurors during their deliberations, despite the fact that defense counsel failed to object to the actions of the trial court while the jury was deliberating and failed to move for a mistrial. In making this determination, we keep in mind the fact that while Cauthen is entitled to a fair trial, he is not entitled to a perfect trial. *Nixon v. State*, 641 So. 2d 751, 755-56 (Miss. 1994).

In *Odom,* the Mississippi Supreme Court ruled that the failure of a prospective juror to respond to a question posed during voir dire examination requires the granting of a new trial, upon proper objection, if the question propounded to the juror was:

(1) relevant to the voir dire examination;

(2) whether it was unambiguous; and

(3) whether the juror had substantial knowledge of the information sought to be elicited.

*Odom*, 355 So. 2d at 1383 (footnote omitted). If the trial court finds that the answer to these questions is in the affirmative, the court should then "determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond." *Id. See also, Fleming v. State*, 687 So. 2d 146, 148 (Miss. 1997). It is difficult to envision in a case such as this a question to a juror more relevant than whether or not the prospective juror is related to the defendant by blood or marriage. This simple question, posed by the trial court and later by the prosecutor, was unquestionably straightforward and unambiguous. Arguably, Shegog could have had a close relative who was a drug dealer named "Toothpick" who was not "Toothpick" Cauthen. On the other hand, we do not know what was said in the jury room and do not know what the other jurors may have concluded when supplied with Juror Shegog's revelation. The record is completely silent on this issue.

In *Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990), the Mississippi Supreme Court stated:

Following a jury's verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and, failing that, we must reverse on appeal. We presume prejudice. Where, as a matter of common experience, a full and correct response would have provided the basis for a peremptory challenge, not rising to the dignity of a challenge for cause, our courts have greater discretion, although a discretion that should always be exercised against the backdrop of *our duty to secure to each party trial before a fair and impartial jury.*

(emphasis added). Once again, the *Myers* court presumed that a proper objection would be raised by the defendant to the juror's misconduct.

In the case *sub judice*, there is no doubt that the information withheld would have provided the basis for a peremptory challenge or a challenge for cause if we assume that Shegog's relative was the Appellant. However, no inquiry was made on the record by either the State or by Cauthen as to whether Shegog's relative was, in fact, Charlie "Toothpick" Cauthen.

The State correctly contends that Cauthen's assignment of error must fail because Cauthen failed to object to the trial court's actions while the jury was deliberating, and because Cauthen did not move for a mistrial. It is well settled that for preservation of error for review on appeal, there must be a contemporaneous objection at the trial level. *King v. State*, 615 So. 2d 1202, 1205 (Miss. 1993); *Mack v. State*, 650 So. 2d 1289, 1301 (Miss. 1994). *See also Collins v. State*, 594 So. 2d 29, 35-36 (Miss. 1992). There is a presumption that the jury is impartial and unbiased, and it is incumbent on the accused to prove otherwise. *United States v. Robbins*, 500 F.2d 650, 653 (5th Cir. 1974). *See also United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991).

In the case *sub judice*, we are faced with a situation where a juror did not disclose, until after deliberations began, important information concerning his relationship to a drug dealer named "Toothpick" who may or may not have been Cauthen. No further inquiry was made of the juror by the trial court or by defense counsel as to his relationship with Cauthen. It is clear that such an inquiry should have been made to determine whether the juror had a relationship with Cauthen and whether the circumstances would have provided the basis for a challenge for cause or a peremptory challenge of Juror Shegog. Nevertheless, we cannot say that the trial court abused its discretion when it denied Cauthen's motion for a new trial since defense counsel voiced no objection while the jury was deliberating and failed to move for a mistrial. In fact, defense counsel specifically agreed to the contents of the note sent by the trial court back to the jury in response to its question concerning Juror Shegog. We can only conclude that defense counsel made the tactical decision to take his chances with Juror Shegog remaining on the jury in the hope that the jury would return a verdict of acquittal. Nevertheless, in the future, we strongly suggest that the trial court place in the record the contents of any communication it has with a jury during its deliberations.

## II. WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO GRANT CAUTHEN'S ENTRAPMENT INSTRUCTION.

In the case *sub judice*, the trial court refused to grant an instruction to the jury which raised the defense of entrapment. Entrapment has been defined by the Mississippi Supreme Court as "the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him for the offense." *Phillips v. State*, 493 So. 2d 350, 354 (Miss. 1986). Since entrapment is an affirmative defense, the burden is upon the accused to show evidence of (1) government inducement to commit the criminal act and (2) that the accused had no predisposition to commit the crime prior to his contact with government agents. *Hopson v. State*, 625 So. 2d 395, 400 (Miss. 1993). In other words, "[i]f the defendant already possessed the criminal intent, and the request or inducement merely gave the defendant the opportunity to commit what he or she was already predisposed to do, entrapment is not a defense." *Id.* at 399. On the other hand, an accused can deny all of the elements of the offense charged and still raise an entrapment defense. *Walls v.*

*State*, 672 So. 2d 1227, 1230 n.1 (Miss. 1996) (following *Mathews v. United States*, 485 U. S. 58, 61-62, 108 S. Ct. 883, 885-86, 99 L. Ed. 2d 54 (1988)). Once an accused makes out a *prima facie* case of entrapment, the burden of proof shifts to the State to prove that the accused was not entrapped. At that point, the predisposition of the accused becomes an issue, and the accused is then entitled to have the defense of entrapment submitted to the jury through proper instructions. *Tanner v. State*, 566 So. 2d 1246, 1248 (Miss. 1990).

The proper standard of review for an appellate court in cases such as this is set out in the recent case of *Walls v. State*, 672 So. 2d 1227, 1230 (Miss. 1996):

[W]hether an issue should be submitted to the jury is determined by whether there is evidence which, if believed by the jury, could result in resolution of the issue in favor of the party requesting the *instruction*. Conversely, only where the evidence is so one-sided that no reasonable juror could find for the requesting party on the issue at hand may the trial court deny an *instruction* on a material issue.

Thus, we must decide whether there is credible evidence in the record to support an entrapment defense so that a rational jury might have found for the accused on the entrapment issue. *Avery v. State*, 548 So. 2d 385, 387 (Miss. 1989).

In the *Walls* case, our supreme court reaffirmed "that an entrapment instruction is not necessary where a defendant was merely 'asked to sell the substance and he was caught.'" *Walls,* 672 So. 2d at 1231 (citing *Ervin v. State*, 431 So. 2d 130, 134 (Miss. 1983)). This is precisely what occurred in the case *sub judice*. The confidential informant, Smith in this case, merely approached his brother-in-law, whom he had known to sell illegal drugs in the past, and asked if he could purchase cocaine for his friend, an undercover narcotics agent. Cauthen readily sold the cocaine to the informant, after a negotiation over the price, for the sum of fifty dollars. No other credible evidence was presented by Cauthen to show entrapment. Thus, we hold that the trial court was correct in refusing to submit an entrapment instruction to the jury, since the record fails to support a *prima facie* case of entrapment. This assignment of error has no merit.

III. WHETHER THE VERDICT OF THE JURY OF GUILTY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

The standard of review in regard to an assignment of error claiming that the guilty verdict is against the overwhelming weight of the evidence is the same as the standard of review on a motion for a new trial, and was fully set out in our foregoing discussion of Cauthen's first assignment of error. Thus, we see no need to repeat that standard of review a second time.

In his brief, Cauthen asserts that the guilty verdict should be set aside because he was entrapped into committing the offense with which he was charged. We have already held that Cauthen was not entitled to an entrapment instruction since he failed to make a *prima facie* case that he had been entrapped into selling the illegal drugs to his brother-in-law. Thus, we cannot say, based on the evidence, that to allow the guilty verdict to stand would be to sanction an unconscionable injustice. This assignment of error has no merit.

**THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY OF CONVICTION**

**OF THE SALE OF A CONTROLLED SUBSTANCE, TO WIT: COCAINE AND SENTENCE TO TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED PENDING GOOD BEHAVIOR AND ORDER TO PAY A $1,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.**