IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-2774
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EDWARD L. RUGGIERO and
CHRISTOPHER S. PARKER,

Defendant-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(June 19, 1995)

Before KING and JONES, Circuit Judges, and LAKE, District Judge.[*]

KING, Circuit Judge:

This appeal centers around the securities and wire fraud
trial of Edward L. Ruggiero and Christopher S. Parker. After a
jury trial, each of the men was convicted on multiple counts of
wire fraud and securities fraud in violation of 18 U.S.C. § 1343,
15 U.S.C. § 78, and 17 C.F.R. § 240. After the trial, the two
defendants moved for a mistrial or a new trial, alleging that
outside information gained by a juror had tainted the verdict.
The district court denied the motions. Ruggiero and Parker

_____

[*] District Judge of the Southern District of Texas, sitting
by designation.

appeal the denial of the motions, and Parker asserts that there was insufficient evidence to support his convictions. We reject all of Ruggiero's and Parker's contentions, and accordingly, we affirm.

## I. BACKGROUND

Ruggiero was a senior auditor at Vista Chemical Company ("Vista"), and Parker was Ruggiero's friend. Vista, a petrochemical company, was a large concern and its stock was publicly traded on the New York Stock Exchange. During Ruggiero's tenure at Vista, the company became involved in negotiations with a German chemical company, RWE-DEA, which was interested in acquiring Vista. The negotiations were a closely guarded company secret, and Ruggiero was not one of the few Vista employees with official knowledge of the talks between Vista and RWE-DEA.

During 1990, while the negotiations between RWE-DEA and Vista were proceeding, Ruggiero and Parker began to invest in short-term option contracts for Vista stock. In early December of 1990, Ruggiero and Parker made very substantial purchases of option contracts. On December 13, 1990, Vista announced that it was being purchased by RWE-DEA at a price-per-share well in excess of the price at which Vista stock had been trading; accordingly, the price of Vista stock increased from $25 to $53-3/4.[1] As result of the sudden and dramatic increase in Vista

_____

[1] There was evidence adduced at trial that this large

2

stock price, Ruggiero and Parker realized profits on their options of $665,000 and $188,000, respectively.

As soon as the sale of Vista was announced, the Securities and Exchange Commission ("SEC") began an investigation of trades in Vista securities. The SEC's interest was piqued by the options trades of Ruggiero and Parker. On the same night that the sale was announced, SEC investigators interviewed both men. At that time, Ruggiero stated that he had engaged in his trades based on rumors of a potential sale, his knowledge of senior executives' trips to Germany, and the cancellation of a meeting. Additionally, Ruggiero pointed to his belief that the stock was undervalued as motivating his purchase of the options.

When Parker was interviewed by the SEC, he explained that his purchases were based upon his belief that Vista was a good take-over target and upon statements by Ruggiero that Vista stock was undervalued. Parker also related that he learned about the merger during the day from his broker, and that he was unaware of whether Ruggiero had purchased any Vista options.

Parker and Ruggiero then conferred on the telephone, and Parker called the SEC to change his story. Parker now stated that he had learned about the sale of Vista early that morning, and that he immediately called Ruggiero to inform him of the

_____

increase in price indicated that the merger was not anticipated by the market. Additionally, a "market maker" who lost money on Ruggiero's and Parker's trades indicated that there was "no public information in the marketplace concerning negotiations between Vista Chemical and any other company" and that "there were no rumors about a takeover in Vista Chemical."

3

sale.  Additionally, Parker now said that he knew Ruggiero had traded in Vista securities, as the men had engaged in frequent discussions about their trades; in fact, in Parker's new story, it was Ruggiero who initially suggested that the men trade in Vista securities.

Eventually, both men were indicted and tried for violations of the securities laws.  At trial, the testimony of another Vista employee--financial analyst Thomas Roberts--was particularly damning to Ruggiero and Parker.  Roberts was part of the Vista team working on the sale, and he testified that Ruggiero repeatedly asked him whether a sale to some Germans was looming.  Roberts also testified that while at first he denied any knowledge of a sale, he eventually told Ruggiero that negotiations regarding a sale were taking place.  After this initial disclosure, Roberts related that he repeatedly updated Ruggiero on the status of negotiations.  On December 6, 1990, Roberts was informed by a Vista attorney that RWE-DEA had offered to purchase Vista for fifty-five dollars a share and that a Vista board meeting was scheduled for December 12, 1990.  The attorney also told Roberts that if all went well at the board meeting, the sale would be announced on December 13.  Roberts testified that he relayed this information to Ruggiero.  Finally, Roberts recounted that after the SEC investigation began, Ruggiero contacted Roberts and told Roberts that the SEC did not know anything, that they would deny knowledge of the December 6

4

statements, and that "[i]f everyone stands tall" no one has anything to worry about.[2]

At the conclusion of the trial, Parker and Ruggiero were convicted on all counts. The day after the convictions were handed down, one of the jurors in the trial, Rick Stuhr, contacted the district court case manager and stated that another juror had told him that she knew that Ruggiero had been fired from another company for stealing. The district court judge then called Stuhr on the telephone and discerned that the other juror was Nelda Neely. That same day, the district court held a hearing in his chambers with Neely, counsel, and the case manager.

During the hearing, Neely testified that one afternoon, while the trial was still ongoing, but when the jury had been dismissed for the afternoon, she was looking through a co-worker's Rolodex when she discovered one of Roberts's business cards from a former job. Neely asked her co-worker about Roberts, and the co-worker replied that Roberts was a "real nice man." Neely also asked her co-worker if he knew Ruggiero, and the co-worker responded affirmatively. Neely realized that she should not ask any more questions, and she "let the matter drop."

---

[2] Roberts's credibility was impeached at trial. He admitted that he himself had illegally traded in Vista stock and that he had passed inside information to his brother as well as to Ruggiero. Roberts also lied to the SEC on two occasions and lied under oath in a deposition. According to the government, however, "[a] week after his deposition . . . Roberts voluntarily approached the SEC and told the full truth without negotiating any immunity for prosecution."

Later that afternoon, Neely's co-worker approached her and informed Neely that "Ruggiero had been in trouble at Global Marine [Ruggiero's former employer] for selling drillstring . . . for his private benefit." Neely did not receive any further information about Ruggiero, and she also testified that there was no discussion of "whether or not [Roberts] was an honest person or anything along those lines."

Neely also recounted that she did not discuss the information she had learned with any of the jurors until after the verdict was returned. After the verdict, however, Neely told Stuhr, who apparently had been reluctant to convict, "Rick if it's any consolation to you . . . this isn't the first time this guy has been in trouble."

The defendants moved for a mistrial or a new trial, alleging that the outside information learned by Neely had tainted the verdict. The district court, however, denied the defendant's motion, finding and concluding that:

> [T]he misconduct on the part of the juror did not interfere with the jury's function. In short, the juror did not reveal this information to the remainder of the panel and there is no reason to believe the truth is, otherwise.
>
> The Court is of the opinion that, although the juror violated the Court's order concerning investigation and research, no taint reached the panel.

Both Ruggiero and Parker appeal the district court's denial of the motion. Additionally, Parker argues that there was insufficient evidence to support his convictions.

## II.  DISCUSSION

A.  Effect of the Outside Information

Ruggiero and Parker argue that their trial was prejudiced as a result of the extrinsic information gained by Neely. Specifically, the two men argue that the introduction of extrinsic evidence to the jury is presumptively prejudicial, and they contend that the government failed to rebut this presumption.  Ruggiero and Parker also aver that the extrinsic information in this case was especially prejudicial because it "revealed that Roberts (the government's star witness) was a `good guy' and that . . . Ruggiero's employment from another company (Global Marine) had been terminated because inventory had come up missing (i.e., he was a `thief')."  Additionally, Ruggiero and Parker maintain that the effect of this information was magnified in light of the importance of Roberts's testimony and the weight assigned to it by the jurors.  Finally, the defendants contend that the fact that only one juror had this information did not mitigate its prejudicial effect because the defendants were entitled to a unanimous verdict.

We often have stated that "[i]n any trial there is initially a presumption of jury impartiality."  United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir. 1983); accord United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827 (1979).  This presumption, however, may be attacked, and "[p]rejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations."  O'Keefe, 722 F.2d at

7

1179; accord Winkle, 587 F.2d at 714; United States v. Howard, 506 F.2d 865 (5th Cir. 1975).

When "a colorable showing of extrinsic influence appears, a court must investigate the asserted impropriety." Winkle, 587 F.2d at 714; accord United States v. Sanchez-Sotelo, 8 F.3d 202, 212 (5th Cir. 1993), cert. denied, 114 S. Ct. 1410 (1994). Further, it is well-settled that "a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room `unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it.'" United States v. Luffred, 911 F.2d 1011, 1014 (5th Cir. 1990) (quoting Llewellyn v. Stynchombe, 609 F.2d 194, 195 (5th Cir. 1980)); accord Sanchez-Sotelo, 8 F.3d at 212; United States v. Ortiz, 942 F.2d 903, 913 (5th Cir. 1991), cert. denied, 504 U.S. 985 (1992); Winkle, 587 F.2d at 714. This rule creates a rebuttable presumption of prejudice to the defendant, and "the government has the burden of proving the harmlessness of the breach." Luffred, 911 F.2d at 1014.

Generally, a court is limited in its ability to inquire about a jury's deliberations. Federal Rule of Evidence 606(b)

forbids a juror from testifying about the deliberative process,[3] and we have noted that:

> the rule separately bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.

Ortiz, 942 F.2d at 913; see also Llewellyn, 609 F.2d at 196 ("Inquiries that seek to probe the mental processes of jurors . . . are impermissible."); Howard, 506 F.2d at 868 ("Well-established case law forbids the eliciting of juror testimony regarding the jury's mental processes, or the influences that any particular evidence had upon the jury's conclusion."). We have also stated, however, that "juror testimony concerning prejudicial extraneous information is a horse of another hue," Ortiz, 942 F.2d at 913, for the rule expressly provides that "`a

_____

[3] The Rule states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b).

juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention.'" Id. (quoting Fed. R. Evid. 606(b)).  Accordingly, we have stated that:

> Post-verdict inquiries into the existence of impermissible extraneous influences on a jury's deliberations are allowed under appropriate circumstances so that a jury-man may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

Llewellyn, 609 F.2d at 196 (internal quotations and citations omitted); accord Sanchez-Sotelo, 8 F.3d at 212; Howard, 506 F.2d at 869.

Thus, in determining whether the government has successfully rebutted the presumption of prejudice and shown that there is no reasonable possibility that the jury was improperly influenced, the district court is to examine "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant."  Luffred, 911 F.2d at 1014; accord Llewellyn, 609 F.2d at 195.

If, after undertaking such an analysis, the district court refuses to grant a new trial, we have stated that we will upset the district court's decision only for an abuse of discretion. Ortiz, 942 F.2d at 913; Sanchez-Sotelo, 8 F.3d at 212. Additionally, we have noted that "[a]n appellate court should accord great weight to the trial court's finding that the [extrinsic] evidence in no way interfered with any juror's decision."  O'Keefe, 722 F.2d at 1179.

10

In the instant case, we find that the district court did not abuse its discretion in concluding that the government rebutted the presumption that Neely's outside investigation prejudiced the jury. Neely's statements regarding the extrinsic evidence support the district court's decision, and the content of the statements heard by Neely does not undermine the district court's conclusion. While Neely heard that Roberts was a "real nice man," she also heard Roberts testify that he had lied to the SEC, that he had lied under oath, and that he had engaged in illegal stock transactions. Similarly, although Neely heard that Ruggiero had been accused of stealing company property, she also had the opportunity to hear Ruggiero testify about the events surrounding his options transaction. Further, Neely heard the extrinsic evidence only after all of the evidence had been introduced, and she did not relay any of the information she had heard to other jurors until after the jury had determined the verdict.

Additionally, the weight of the other evidence adduced at trial supports the district court's decision. The government presented strong evidence against both Ruggiero and Parker, establishing that the two men began regularly trading in Vista options after Roberts began to give them information. Further, there was evidence that the trades coincided with times that the sale of Vista was most likely, and the options purchased by the men were only of value if the company was sold quickly.

11

We have affirmed a district court's determination that the government overcame the presumption of prejudice in cases involving far more egregious juror misconduct. For example, in Ortiz, we found no error in the district court's conclusion that the government rebutted the presumption of prejudice raised by: one juror's investigation of an airport involved in drug smuggling operations; a second juror's visit to an apartment complex described in the trial and that juror's description of that complex to other jurors during deliberations; and a third juror's statement "that she knew one of the individuals mentioned during the trial . . . and that she knew he was a drug dealer and that the people on trial were guilty." Ortiz, 942 F.2d at 913. Considering only the objective factors surrounding the extrinsic evidence, we find that the district court's refusal to grant a new trial or a mistrial was not an abuse of discretion.[4]

---

[4] Ruggiero argues that the district court improperly inquired into Neely's thought processes. The district court asked Neely, "[d]o you believe that on learning that [extrinsic information] that it had any effect on your ability to be fair and impartial about the evidence in the case?" Neely responded negatively. While this testimony may have been inadmissible under Federal Rule of Evidence 606(b), we need not reach the question of the effect of the evidence which may or may not have been admissible. There is no indication that the district court considered this evidence in its decision, and our conclusion that the district court did not abuse its discretion in denying the defendants' motion for a new trial or a mistrial is based only the admissible evidence and the factors we articulated Luffred and Llewellyn. See United States v. Maree, 934 F.2d 196, 201 (9th Cir. 1991) (noting that when examining whether juror misconduct warranted a new trial and when presented with declarations part of which were inadmissible under Rule 606(b), an appellate court's review was "limited to the admissible portions of the declarations"); Howard, 506 F.2d at 869 (instructing a district court to "disregard the portions of the affidavit purporting to reveal the influence the alleged

B.  Sufficiency of the evidence

Parker challenges his convictions for insufficient evidence. In challenging the 10b-5 convictions, Parker contends that because he was not an employee of Vista and had no fiduciary duty to the company, he can only be held liable for violations of the securities law if he knew that Ruggiero had inside information and that Ruggiero was breaching a duty by disclosing that information to Parker.  Parker alleges that the government failed to prove these elements.  Similarly, with regard to the conviction for violating the tender offer rules of § 14e of the Securities Exchange Act of 1934, Parker argues that the government failed to "present any evidence that Mr. Parker either (1) was in possession of material, nonpublic information regarding the merger or (2) acquired information about Vista from an employee acting on behalf of Vista."  Finally, Parker argues that since the convictions on the securities fraud claims fail for lack of evidence, there was also insufficient evidence to prove the intent to defraud required to sustain a conviction for wire fraud.  We reject all of Parker's contentions.

In evaluating the findings of a jury, we do not inquire whether the "evidence excludes every reasonable hypothesis of innocence or is wholly inconsistent with every conclusion except that of guilt."  United States v. Pigrum, 922 F.2d 249, 254 (5th

_____

prejudicial extrinsic material had upon the jurors, and it must avoid examination of any other aspect of the juror's mental processes").

13

Cir.), cert. denied, 500 U.S. 936 (1991). Rather, we have stated that we will "sustain the verdict if a rational trier of fact could have found all elements of the offense beyond a reasonable doubt." United States v. Osum, 943 F.2d 1394, 1404 (5th Cir. 1991); see also United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993) ("The standard of review in assessing a challenge to the sufficiency of the evidence in a criminal case is whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt." (internal quotations omitted)), cert. denied, 114 S. Ct. 1310 (1994). Moreover, as we have often noted, "[o]n appeal, this court must view the evidence . . . and all inferences reasonably drawn from it, in the light most favorable to the verdict." Osum, 943 F.2d at 1404; accord Mergerson, 4 F.3d at 341. Finally, we have stated that this standard applies regardless of whether the conviction is based on direct or circumstantial evidence. Mergerson, 4 F.3d at 341.

Section 10(b) of the Securities Exchange Act of 1934 and the rules promulgated under it, particularly Rule 10b-5, prohibit insider trading.[5] As the Supreme Court described, there are two

---

[5] Section 10(b) provides in part that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive

elements of a Rule 10b-5 violation: "`(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure.'" Dirks v. SEC, 463 U.S. 646, 653-54 (1983) (quoting Chiarella v. United States, 445 U.S. 222, 229 (1980)). The prohibitions under 10b-5 are not animated by the nonpublic nature of the information traded. See id. (noting that "there can be no duty to disclose where the person who has traded on inside information was not [the corporation's] agent, . . . was not a fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their

> device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

The applicable rule provides that:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, or
>> (c) To engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

15

trust and confidence." (internal quotations omitted)).  Rather,
liability under § 10b-5 attaches by virtue of the relationship
between the shareholders and the individual trading on inside
information.  Id.

Further, an individual need not have a direct relationship
with the company to violate the securities law by trading on
inside information; a "tippee", one who acquires information from
an insider, may also violate the rules against inside
information.  The Supreme Court has stated that "a tippee assumes
a fiduciary duty to the shareholders of a corporation not to
trade on material nonpublic information only when the insider has
breached his fiduciary duty to the shareholders by disclosing the
information to the tippee and the tippee knows or should know
that there has been a breach."  Dirks, 463 U.S. at 660.

Section 14(e) of the Securities Exchange Act of 1934
prohibits fraud and other manipulative acts in conjunction with
tender offers.[6]  See 15 U.S.C. § 78n(e); United States v.

---

[6]  Section 14(e) provides that:

It shall be unlawful for any person to make any untrue
statement of a material fact or omit to state any
material fact necessary in order to make the statements
made, in the light of the circumstances under which
they are made, not misleading, or to engage in any
fraudulent, deceptive, or manipulative acts or
practices, in connection with any tender offer or
request or invitation for tenders, or any solicitation
of security holders in opposition to or in favor of any
such offer, request, or invitation.  The Commission
shall, for the purposes of this subsection, by rules
and regulations define, and prescribe means reasonably
designed to prevent, such acts and practices as are
fraudulent, deceptive, or manipulative.

16

Chestman, 947 F.2d 551, 561 (2d Cir. 1991), cert. denied, 503 U.S. 1004 (1992).  To establish a violation of this section, the government must prove that a defendant traded on information that he knew had been acquired directly or indirectly from either the company, a company official, or a person acting on the company's behalf.  Finally, the Supreme Court has noted that in proving scienter in fraud cases, "circumstantial evidence can be more than sufficient."  Herman & MacLean v. Huddleston, 459 U.S. 375, 391 n.30 (1983).

In the instant case, there was sufficient evidence to support Parker's convictions for violations of § 10b and § 14e.

_____

15 U.S.C. § 78n(e).

  The relevant rule under this section, Rule 14(e), provides that:

> If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or had reason to know has been acquired directly or indirectly from:
>       . . .
>
>       (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e-3.

17

As to the § 10b convictions, it seems clear that a rational juror could find that Ruggiero was in possession of inside information. Roberts testified that he gave Ruggiero inside information, and there is no question that a rational juror could credit his testimony.

Similarly, there was sufficient evidence for the jury to conclude that Parker knew or should have known that Ruggiero's information was gained via the breach of a fiduciary duty. After the investigation into his transactions commenced, Parker lied to the SEC, conferred with Ruggiero, and then changed his story. A reasonable juror could conclude that these actions indicated that Parker knew the information that he received from Ruggiero was improperly acquired, and that the evidence was sufficient for a reasonable juror to find knowledge or at least recklessness. Moreover, the timing of Parker's and Ruggiero's option purchases (coinciding with sale signals no one else in the market noticed) provide ample evidence of Parker's knowledge regarding the sources of Ruggiero's information.

In addition to supporting the 10b conviction, Parker's knowledge of Ruggiero's position as an internal auditor also provides evidence from which a rational juror could conclude that Parker knew the information on which he was trading was acquired from a Vista employee in violation of § 14e. Simply put, there was ample evidence for the jury to conclude that Parker knew or should have known that Ruggiero was an employee of Vista and that Ruggiero had acquired the information improperly.

18

Finally, we have stated that "[t]o sustain a conviction for wire fraud under 18 U.S.C. § 1343, the government must present evidence of (1) a scheme to defraud, and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." United States v. Keller, 14 F.3d 1051, 1056 (5th Cir. 1994). Additionally, "[t]he government must prove a specific intent to defraud, which requires a showing that the defendant intended for some harm to result from his deceit." United States v. Loney, 959 F.2d 1332, 1337 (5th Cir. 1992).

In the instant case, Parker argues that the government failed to prove that Parker "engage[d] in securities fraud either as a tippee or in connection with a tender offer. No evidence exists, therefore, that [Parker] participated in a scheme to defraud." As noted above, we reject Parker's contention that there was insufficient evidence to support the securities law convictions. Accordingly, we find that there was sufficient evidence that Parker used the wires in furtherance of the fraud, thereby violating 18 U.S.C. § 1343.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM.

19