# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 13, 2015

Lyle W. Cayce
Clerk

No. 14-50406

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

CORNELIUS TYWARREN WILSON, also known as Pie; CHRISTOPHER ANDREW WILSON, also known as Wiggy; BRYANT KEITH PRESLEY, also known as Tweety,

      Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PER CURIAM:*

    Appellants Christopher Wilson ("Christopher"), Cornelius Wilson ("Cornelius"), and Bryant Presley ("Presley") were convicted of various drug trafficking and weapon offenses arising from their participation in a drug distribution ring in Killeen, Texas. Christopher appeals his conviction for violating 18 U.S.C. § 924(c)(1)(A)—possessing a firearm in furtherance of a drug trafficking offense—arguing that the government produced insufficient

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-50406

evidence to support the jury's verdict.  Christopher also challenges the district court's denial of his motion for new trial because, according to Christopher, the district court should have investigated a report of an improper communication with the jury.  Christopher challenges his sentence, arguing that the district court improperly enhanced his offense level for being an "organizer, leader, manager, or supervisor of at least one individual" under U.S.S.G. § 3B1.1(c).  Cornelius appeals his sentence, arguing that the district court erroneously adjusted his offense level for his role as an "organizer or leader" under U.S.S.G. § 3B1.1(a) and because the court improperly converted all of the powder cocaine sold by Cornelius into cocaine base for sentencing purposes.  Presley appeals his sentence because, according to Presley, the district court improperly applied the career offender guideline, U.S.S.G. § 4B1.1, when Presley had only one prior qualifying conviction.

Because the evidence supports the jury's verdict and the district court did not err in imposing its sentence with respect to Cornelius and Christopher, we affirm their convictions and sentences.  However, because we conclude that the district court erred in its application of the Sentencing Guidelines with respect to Presley, we vacate his sentence and remand to the district court for resentencing.

## I. BACKGROUND

Appellants engaged in a cocaine distribution scheme in Killeen, Texas.  Cornelius made regular trips to Austin, Texas to obtain large amounts of cocaine.  Cornelius brought the cocaine back to Killeen, Texas.  He and his brother, Christopher, then sold a portion of the cocaine to the other participants, including Presley, who then distributed it to retail buyers or sub-distributors.  On occasion, Cornelius would front the drugs to the other co-conspirators.  When Cornelius did not have the drugs his buyers requested, he would refer the buyer to other participants.

2

No. 14-50406

Appellants' activities were first brought to the attention of the Killeen Police Department ("KPD") by a confidential informant ("CI") who agreed to conduct a controlled buy. KPD contacted the Drug Enforcement Agency and the Federal Bureau of Investigation to assist in the investigation. With the three law enforcement agencies monitoring the CI's activities, the CI made contact with Appellants, along with other co-conspirators, and successfully purchased large amounts of cocaine and cocaine base on several different occasions. The law enforcement agencies monitored these transactions with body wires, phone taps, and visual surveillance. Based on these transactions, KPD was able to identify the individuals dealing the narcotics, where they resided, and their phone numbers. Through the investigation, officers learned of Cornelius, Christopher, and Presley.

On May 14, 2013, law enforcement officers went to Christopher's house, attempting to execute an arrest warrant for Christopher. According to Jason Hernandez ("Hernandez"), Christopher's neighbor, an individual known to Hernandez as "Boocee" knocked on Hernandez's rear door. This apparently occurred shortly after law enforcement entered the neighborhood headed to Christopher's house. With the permission of Hernandez, Boocee entered Hernandez's home and started making phone calls. Boocee handed Hernandez a plastic grocery bag and asked him to store it. Hernandez agreed, and Boocee left the house. The bag contained a firearm, scale, and large bag of "white stuff" Hernandez believed to be cocaine.

3

No. 14-50406

Later on that night, Boocee called Hernandez and told him to give the grocery bag to Hernandez's neighbor across the street, Keith Marinnie ("Marinnie").[1] Hernandez passed the grocery bag off as instructed.

Marinnie corroborated the testimony of Hernandez. Marinnie went to Hernandez's home and picked up a grocery bag containing cocaine, a scale, and a firearm. Boocee called Marinnie and told him to deliver the bag to a "white female in a truck." Marinnie complied and law enforcement never recovered the contents of the grocery bag.

At trial, Tecoma Gunter ("Gunter"), an acquaintance of Christopher's, testified that he knew Christopher as Boocee. Charles Pickett ("Pickett"), another customer of Appellants, testified that he also knew Christopher as Wiggy and Boocee.

Anthony Bell ("Bell"), Christopher's roommate and customer, testified at trial that he assisted Christopher in the distribution of cocaine. Specifically, at Christopher's direction, Bell would sell cocaine to Christopher's customers and leave the money on the table for Christopher. In exchange for his help, Christopher gave Bell cocaine. Bell also testified that he saw Christopher's suppliers, including Cornelius, bring cocaine to Christopher. With respect to the firearm, Bell explained that he had observed Christopher with two different firearms inside the residence. According to Bell, the grocery bag most likely contained the gun acquired by Christopher from a drug customer named Buck. Bell told the jury that Christopher received the gun in exchange for three rocks of crack cocaine. Bell further testified that Christopher kept the firearm in the bedroom closet. On May 14, 2013, just before the police arrived

---

[1] This phone call was recorded and played at the trial. The government also presented text messages sent by Hernandez to "Boocee." The phone number used by Boocee was the same phone number associated with Christopher Wilson.

4

at Christopher's house, Bell saw Christopher grab the firearm—which Bell knew had the magazine in it—the scale, and the drugs, and run out of the house. A few minutes later, Christopher returned to the house without the items and Christopher, Bell, and Christopher's girlfriend got into Christopher's vehicle and left the residence.

The jury found all three defendants guilty.   The jury found Cornelius guilty of two counts of conspiracy to possess with intent to distribute at least 280 grams of cocaine base[2] and possession with intent to distribute cocaine base.[3]  The jury found Christopher guilty of two counts of conspiracy to possess with intent to distribute at least 280 grams of cocaine base[4], possession with intent to distribute cocaine[5], and possession of a firearm during the commission of a drug trafficking crime.[6]  The jury also found Presley guilty of one count of conspiracy to possess with intent to distribute at least 280 grams of cocaine base[7], possession with intent to distribute cocaine base[8], possession with intent to distribute hydrocodone[9], and possession with intent to distribute marijuana.[10]

We consider each of Appellants' challenges below.

---

[2] 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(iii).

[3] 21 U.S.C. §§ 84(a)(1) and 841(b)(1)(C).

[4] 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(iii).

[5] 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii).

[6] 18 U.S.C. § 924(c)(1)(A)(i).

[7] 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(iii).

[8] 21 U.S.C. §§ 846, 841(a)(1), and (841(b)(1)(C).

[9] 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(E).

[10] 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(E).

No. 14-50406

## II. DISCUSSION

### A. Challenges Presented by Christopher Wilson

On appeal, Christopher argues that the government presented insufficient evidence to support his conviction of possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). He also argues that the district court erred by denying his motion for a new trial based on an improper communication between an associate of Appellants and the jury.  Finally, Christopher challenges the district court's enhancement of his offense level for his role as an "organizer, leader, manager, or supervisor" of at least one individual.

### i. Sufficiency of the Evidence on the Weapons Offense

If a defendant properly preserves his challenge to the sufficiency of the evidence by moving for a judgment of acquittal at the end of the prosecution's case and at the close of evidence, then we review the district court's denial of a motion for judgment of acquittal de novo.[11]  If the defendant fails to properly preserve his sufficiency claim, then we review the defendant's assertion on appeal for a manifest miscarriage of justice.[12]

The government contends on appeal that Christopher failed to preserve his sufficiency challenge because, although he moved for a judgment of acquittal, his argument shifted from insufficient evidence of possession of the weapon to insufficient evidence that his possession was in furtherance of his drug trafficking.  For purposes of this appeal, we assume without deciding that Christopher properly preserved his sufficiency challenge.  Thus, we review his challenge under the familiar standard. We will uphold the jury's verdict "if a

---

[11] *See United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (citing *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010)).

[12] *See United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2005).

reasonable trier of fact could conclude . . . the elements of the offense were established beyond a reasonable doubt . . . ."[13]

The elements of the weapons offense are defined by 18 U.S.C. § 924(c)(1)(A), which states, in pertinent part:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . ., uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime –
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;

Christopher argues that the government failed to establish that he possessed a weapon in furtherance of a drug trafficking offense.

Possession of a firearm "is 'in furtherance' of the drug trafficking offense when it furthers, advances, or helps forward that offense."[14]  In determining whether possession of the firearm is in furtherance of a drug trafficking offense we consider several factors, including:

> [T]he type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.[15]

---

[13] *McDowell*, 498 F.3d at 312 (quoting *United States v. Ragsdale*, 426 F.3d 765, 770-71 (5th Cir. 2005).

[14] *United States v. Ceballos-Torres*, 218 F.3d 409, 411 (5th Cir. 2000), *amended in part*, 226 F.3d 651 (5th Cir. 2000).

[15] *Id.* at 414-15.

No. 14-50406

Based on our review of the record, a reasonable juror could conclude that Christopher's firearm possession furthered, advanced, or helped forward the drug trafficking offense. Christopher acquired the semi-automatic Ruger handgun from one of his customers in exchange for narcotics.[16] Christopher stored the firearm in a bedroom closet inside the house where he conducted drug sales. Although the trial record is unclear as to which room Christopher usually stored his narcotics or drug proceeds, the firearm was readily accessible by all occupants anywhere in the residence.[17] Bell, Christopher's roommate, testified at trial that he knew Christopher kept the firearm loaded, because he saw Christopher insert a fully-loaded magazine into the firearm on previous occasions. He also saw Christopher grab and place into a grocery bag the handgun, cocaine, and scale before leaving the house. Gunter, Christopher's friend, testified that he saw Christopher with a loaded firearm. Pickett, a customer of Christopher's and fellow drug dealer in Killeen, Texas, testified that he saw Christopher with a firearm when he met Christopher for a drug transaction. Finally, FBI Agent Daniel Tichenor testified based on his experience and training that firearms are often owned by drug dealers to protect themselves, their drug supply, and their money. Viewing all facts and inferences in the light most favorable to the verdict, we are satisfied that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that

---

[16] *See United States v. Robinson*, 627 F.3d 941, 957 (4th Cir. 2010) (an exchange of narcotics for a firearm supports the jury's conviction under 924(c)).

[17] *See United States v. Jaimes*, 397 F. App'x 988, 990 (5th Cir. 2010) (firearms that were readily accessible in a bedroom closet and were in close proximity to a bag of cocaine, ammunition, scales, currency, and drug ledgers was sufficient evidence to support the jury's verdict).

No. 14-50406

Christopher possessed a firearm in furtherance of the drug trafficking offense.[18]

Christopher argues next that a fatal variance exists between the indictment and the evidence presented at trial. Specifically, Christopher argues that the government indicted him on acts he committed as Christopher Wilson and Wiggy and that he was surprised by any evidence at trial relating to acts committed by Boocee.

A fatal variance exists only when there has been variance between the evidence and the indictment such that it effects the substantial rights of the defendant.[19] The indictment charged Christopher Wilson, also known as Wiggy, with the drug trafficking and weapon offenses. The evidence presented at trial established that "Boocee" was one of Christopher's nicknames and that he participated in the drug conspiracy and possessed a firearm. Evidence of Christopher's activities committed under his well-known nickname could not have been a surprise. Thus, there was no variance between the evidence presented at trial and the facts alleged in the indictment.

## ii. Motion for New Trial

The record indicates that the court submitted the case to the jury at 3:01 p.m. on Friday, March 7, 2014. The jury deliberated for two hours on the 7th before the court allowed them to go home for the day. After the jurors entered the courthouse parking lot, an unidentified person shouted, "We hope our brother gets to come home." A court security officer who was present in the parking lot reported this event to the judge. Defense counsel discovered this

---

[18] *See United States v. Thomas*, 496 F. App'x 453, 454-55 (5th Cir. 2012) (packaging large amounts of narcotics inside the house where defendant stored two firearms, one loaded, along with a large amount of cash in the bedroom supported defendant's conviction under 924(c)).

[19] *Berger v. United States,* 295 U.S. 78, 82 (1935).

incident while the jury was deliberating and did not complain about the court's handling of it until after the verdict.

Christopher and Cornelius filed a motion for a new trial based on this improper interaction with the jury.  The district court denied both motions because it found "[i]n no way was this reported to have intimidated or influenced the juror.  To the contrary, it was, if anything, a plea for a finding of not guilty."

On appeal, Christopher claims that the district court erred by failing to properly investigate the communication with the jury and by denying his motion for a new trial.  According to Christopher, the district court should have promptly informed defense counsel about this statement and then questioned the suspect juror about the communication.

We review the district court's determination that the jury was not improperly tainted by extrinsic influence for clear error, and "we review the court's choice of methods to investigate the possibility of extrinsic taint for abuse of discretion."[20]  As we have explained before, "district courts are not required to conduct a 'full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury."[21]  When determining the appropriate inquiry, the court "must balance the harm resulting from the emphasis such action would place upon the misconduct and the disruption

---

[20] *United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (citing *United States v. Cantu*, 167 F.3d 198, 201 (5th Cir. 1999)); *See United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012) ("[A] a district court, based on its unique perspective at the scene, is in a far superior position than we are to appropriately consider allegations of juror misconduct, both during trial and during deliberations.") (alterations omitted) (quoting *United States v. Boone,* 458 F.3d 321, 329 (3d Cir.2006)); *See also United States v. Ruggiero,* 56 F.3d 647, 653 (5th Cir.1995) ("[A]n appellate court should accord great weight to the trial court's finding that the extrinsic evidence in no way interfered with any juror's decision.") (internal quotation marks and alterations omitted).

[21] *Id.*; *See United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998).

No. 14-50406

involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct."[22]

Although the district court did not immediately alert the attorneys to the report of a possible improper communication with the jury (which would have been prudent), there is no evidence in the record that the jury was influenced or prejudiced by the statement. By the nature of the comment, the unidentified person sought a verdict of not guilty, and the jury convicted all three defendants.[23] Therefore, we conclude that the district court did not abuse its discretion by not conducting an evidentiary hearing or by questioning the jury about the communication. Based on this limited remark, the district court did not err in finding that it did not taint the jury.

### iii.  Leadership Enhancement

The district court adopted the Presentence Report's ("PSR's") two-level upward adjustment to Christopher's offense level under U.S.S.G. § 3B1.1(c) for being an organizer, leader, manager, or supervisor of the conspiracy. Christopher argues on appeal that there is insufficient evidence to support the court's finding that Christopher was a leader.

We review a district court's interpretation and application of the Sentencing Guidelines de novo, and its factual findings for clear error.[24] The district court's determination that Christopher was a leader under U.S.S.G. § 3B1.1 is a factual determination reviewed for clear error.[25] "A factual finding

---

[22] *Id.* (quoting *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995)).

[23] *See United States v. Tarpley*, 945 F.2d 806, 811 (5th Cir. 1991) ("It is not sufficient to trigger the requirement of further investigation that a juror have had contact with an outside source of information. Rather, the defendant must show that extraneous prejudicial material had likely reached the jury.") (citation and quotation marks omitted).

[24] *United States v. Zuniga,* 720 F.3d 587, 590 (5th Cir. 2013).

[25] *United States v. Villanueva*, 408 F.3d 193, 204 (5th Cir. 2005).

No. 14-50406

is not clearly erroneous if it is plausible in light of the record as a whole. We will find clear error only if a review of the record results in a 'definite and firm conviction that a mistake has been committed.'"[26]   Finally, "[w]hen the evidence demonstrates that a defendant directed another in his drug trafficking activities, . . . sentence enhancement under § 3B1.1(c) is appropriate."[27]

As discussed above, Bell was a customer and roommate of Christopher. He testified at trial that he sold narcotics out of the residence at Christopher's direction when Christopher was away. Christopher would call Bell and tell him that a customer was going to the house to buy narcotics. Christopher would also tell Bell the quantity of drugs to sell. Bell would then separate, weigh, and package the narcotics based on the information that was given to him by Christopher. After Bell completed the transaction, he would leave the proceeds on the table for Christopher. In return for his help, Bell would receive cocaine to support his habit. Bell's testimony was corroborated by recorded telephone conversations between Bell and Christopher.

Bell's testimony and accompanying telephone conversations demonstrates that Christopher directed Bell in his drug trafficking activities. Therefore, the district court did not err by finding that Christopher was a leader. An enhancement under Section 3B1.1(c) was appropriate.

## B. Challenges Presented by Cornelius Wilson

On appeal, Cornelius makes two challenges to the district court's calculation of his guidelines sentence, which we discuss below.

---

[26] *Zuniga*, 720 F.3d at 590 (quoting *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011) (internal quotation marks and citation omitted)).

[27] *United States v. Turner*, 319 F.3d 716 (5th Cir. 2003) (citing *United States v. Posada-Rios*, 158 F.3d 832, 881 (5th Cir. 1998).

No. 14-50406

## i. Conversion of Cocaine Into Cocaine Base

In calculating Cornelius's sentence, the district court adopted the PSR's recommendation attributing 22.96 kilograms of cocaine to Cornelius. The PSR derives the quantity of drugs from the testimony of two specific customers, Pickett and Kevin Lee ("Lee"). According to the PSR, Pickett purchased—from both Cornelius and Christopher—up to an ounce of cocaine a day from mid-2012 until May 2013, resulting in 8.93 kilograms of cocaine. Lee purchased—from only Cornelius—up to an ounce of cocaine a day from the end of 2011 until May 2013, resulting in 14.03 kilograms of cocaine. The district court adopted the PSR's recommendation to convert all of the cocaine sold to Lee and Pickett to crack cocaine. [28]

Cornelius argues that the district court erred in its conversion of the narcotics based on the court's conclusion that it was reasonably foreseeable to Cornelius that Lee and Pickett would convert the cocaine into cocaine base.

Under the Sentencing Guidelines, a defendant's offense level can be increased based on the relevant conduct of others involved in the same conspiracy.[29] Thus, the district court can properly attribute a co-conspirator's conversion of cocaine into cocaine base for sentencing purposes so long as it is reasonably foreseeable to the defendant that the conversion will occur.[30]

We review the district court's findings of fact at sentencing for clear error, and its application of the Sentencing Guidelines de novo.[31] If, after reviewing the record, the district court's view of the evidence is plausible, the

---

[28] Cornelius does not challenge on appeal the amount of drugs attributed to him.

[29] *See* U.S.S.G. § 1B1.3.

[30] *Id.*

[31] *United States v. Burns*, 526 F.3d 852, 859 (5th Cir. 2008) (citing *United States v. Booker*, 334 F.3d 406, 412 (5th Cir. 2003)).

13

district court's finding must be affirmed even if we would have weighed the evidence differently.[32]

Cornelius had actual knowledge that Lee converted the cocaine into cocaine base. Lee testified at trial that he converted the cocaine into cocaine base. The government played a recorded phone conversation between Lee and Cornelius in which Lee told Cornelius that the cocaine turned a brown color during the conversion process. This conversation clearly establishes that Cornelius knew Lee converted the cocaine Cornelius sold to him. Thus, the district court's finding that Cornelius could reasonably foresee that the cocaine he sold to Lee was being converted into cocaine base was not in error.

Because we find that the district court did not err by converting the 8.96 kilograms of cocaine sold to Lee, we need not address whether the conversion of the other 14 kilograms sold to Pickett was clearly erroneous. The properly converted 8.96 kilograms of crack cocaine is a sufficient quantity of drugs to support Cornelius's base offense level of 38. [33]

### ii. Leadership Enhancement

Cornelius also challenges the district court's four-level enhancement to his offense level under U.S.S.G. § 3B1.1(a), because, according to Cornelius, there is insufficient evidence to support the court's finding that he was a leader of five or more people.

U.S.S.G. § 3B1.1(a) provides a four-level sentencing enhancement "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." In determining whether a defendant is an organizer or leader, the sentencing court considers (1) "the

---

[32] *Id.*

[33] *See* U.S.S.G. § 2D1.1(c)(1) (any drug quantity over 8.4 kilograms of cocaine base establishes an offense level of 38).

exercise of decision making authority"; (2) "the nature of participation in the commission of the offense"; (3) "the recruitment of accomplices"; (4) "the claimed right to a larger share of the fruits of the crime"; (5) "the degree of participation in planning or organizing the offense"; (6) "the nature and scope of the illegal activity"; and (7) "the degree of control and authority exercised over others."[34]

The district court's determination that Cornelius was a leader under U.S.S.G. § 3B1.1 is a factual determination reviewed for clear error.[35]   As stated above, "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole.  We will find clear error only if a review of the record results in a 'definite and firm conviction that a mistake has been committed.'"[36]

The court was entitled to rely on the finding made in the PSR that Cornelius was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  This finding was supported by the evidence produced during the trial, which established that Cornelius—the main supplier of narcotics to the conspiracy—exercised control over several participants in the conspiracy, which included more than five people.  On more than one occasion, when the CI called to purchase narcotics from Cornelius, Cornelius sent him to two other dealers that Cornelius fronted with narcotics and Cornelius told those distributors to sell to the CI.  Cornelius also had participants of the conspiracy use their name instead of his name on assets and liabilities.  For example, Cornelius used a storage locker that was registered to Bell.  According to Bell's testimony, Cornelius told Bell to put the storage locker in his name so the mother of Cornelius's child did not know

---

[34] U.S.S.G. § 3B1.1, cmt. n.4.

[35] *Villanueva*, 408 F.3d at 204.

[36] *Zuniga*, 720 F.3d at 590.

where he stored his things. Similarly, Bell's name was on the lease and utilities to the residence where Cornelius lived, even though Bell never lived there. On at least two occasions, Cornelius demonstrated his leadership role in the conspiracy by telling the CI that he could join the conspiracy if he "played his cards right." The CI explained in his testimony that he interpreted Cornelius's statements to mean Cornelius was recruiting him to join the conspiracy. Also, the testimony of the co-conspirators established that Cornelius sold and fronted cocaine to many of them and their sub-distributors.

Based on this evidence, we cannot say that the district court clearly erred by concluding that Cornelius was a leader of the conspiracy which had five or more participants. An enhancement under U.S.S.G. § 3B1.1(a) is supported by the record.

## C. Presley's Career Offender Enhancement

Presley challenges the district court's application of the career offender guideline, U.S.S.G. § 4B1.1. The career offender guideline increases the applicable guideline range when a defendant has "at least two prior felony convictions of either a crime of violence or a controlled substance offense."[37] The Sentencing Guidelines defines a crime of violence, in pertinent part, as any felony that "is burglary of a dwelling, . . . or otherwise involves conduct that presents a serious potential risk of physical injury to another."[38]

The PSR alleged that Presley had at least two prior felony convictions that were either a crime of violence or a controlled substance offense. Specifically, Presley was convicted in Kentucky of trafficking a controlled substance in or near a school and in Texas of burglary of a habitation. The burglary conviction is the only relevant conviction for this appeal. In applying

---

[37] U.S.S.G. § 4B1.1(a).

[38] U.S.S.G. § 4B1.2(a)

the career offender guideline, the district court concluded that the Texas burglary conviction was a crime of violence and enhanced Presley's offense level from 30 to 37. Using this increased offense level, Presley's guidelines imprisonment sentencing range was increased from 168-210 months to 360 months to life. The district court sentenced Presley to serve 360 months of imprisonment.

Presley argues for the first time on appeal that his Texas burglary conviction under Section 30.02(a)(3) does not qualify as a crime of violence under the career offender guideline and the career offender guideline cannot apply.

Because Presley did not raise this challenge at the district court, we review it for plain error.[39] Under plain error review, we will reverse only if: (1) there is an error that has not been intentionally abandoned; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights"; and (4) this court chooses to exercise its discretion because the "error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[40]

Texas Penal Code § 30.02(a)(3) states that "a person commits an offense if, without the effective consent of the owner, the person enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." Subsection three differs from sections one and two because subsection three does not require proof that the defendant intended to commit a felony or theft before entering the building.

---

[39] *See* Fed. R. Crim. P. 52(b).

[40] *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc) (internal quotation marks and alteration omitted) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

No. 14-50406

Using the categorical approach, as we are required to do, we have held that a conviction under Section 30.02(a)(3) does not qualify as a generic burglary because the statute does not require proof that the defendant intended to commit a felony when he entered the habitation.[41]

The government contends that Section 30.02(a)(3) falls under the residual clause of the crime of violence definition. The residual clause allows any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another" to qualify as a crime of violence for purposes of the guideline.[42]

This Court treats cases dealing with the career offender guideline "interchangeably" with cases dealing with the Armed Career Criminal Act ("ACCA").[43] For purposes of this appeal, the ACCA's definition of a "violent felony" is identical to the career offender guideline's definition of a "crime of violence."[44] Thus, our precedent regarding the ACCA's definition of a violent felony is directly applicable to the guideline's definition of a crime of violence.

---

[41] *United States v. Constante*, 544 F.3d 584, 585 (5th Cir. 2008) (citing *Taylor v. United States*, 495 U.S. 575 (1990)).

[42] U.S.S.G. § 4B1.1(a)(2).

[43] *United States v. Moore*, 635 F.3d 774, 776 (5th Cir. 2011) (per curiam).

[44] Violent felony under the ACCA is defined as follows:

> The term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, . . . that—
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another;

18 U.S.C. § 924(e)(2)(B)

18

No. 14-50406

In *Constante*, we held that a conviction under Section 30.02(a)(3) is not a violent felony under the ACCA's definition. The *Constante* panel quoted the entire definition of "violent felony", including the ACCA's residual clause, and held that a conviction under Section 30.02(a)(3) is not a violent felony.[45] Following *Constante's* holding, as we must, we conclude that Texas Penal Code § 30.02(a)(3) is not a crime of violence under the career offender guideline.[46]

Our decision today is consistent with this Circuit's unpublished case-law post-*Constante*.[47] In *United States v. Gomez*, we found that the district court plainly erred by sentencing Gomez as a career offender, because the government conceded on appeal that Gomez's prior conviction under Section 30.02(a)(3) did not support application of the career offender guideline.[48] In that case, we noted that "[a] burglary conviction under Texas Penal Code § 30.02(a)(1) qualifies as a crime of violence [under the career offender guideline] but a conviction under § 30.02(a)(3) does not qualify."[49] We recently reaffirmed this position in *United States v. St. Clair*, holding that the district court plainly

---

[45] 544 F.3d at 585.

[46] In *United States v. Ramirez*, an unpublished opinion, a panel held that *Constante's* relative silence about one part of the ACCA's definition of a violent felony means that *Constante* did not resolve whether § 30.02(a)(3) is a violent felony. *Ramirez*, 507 F. App'x 353, 354 (5th Cir. 2013) (per curiam).

But *Constante* clearly held that a conviction under § 30.02(a)(3) is not a violent felony. See 544 F.3d at 584, 586—87. Neither we nor the *Ramirez* panel could overrule the precedential decision of a previous panel. *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014). Further, *Ramirez* is unpublished and is therefore non-precedential. See 5TH CIR. R. 47.5.4. It is clear and obvious that a district court cannot diverge from a precedential opinion's holding, regardless of subsequent non-precedential decisions such as *Ramirez*.

[47] *See United States v. Gomez*, 539 F. App'x 528 (5th Cir. 2013); *See also United States v. St. Clair,* No. 14-50287, 2015 WL 1611666 (5th Cir. Apr. 13, 2015); *United States v. Emeary*, No. 09-40529, 2015 WL 4524299, *2 (5th Cir. July 23, 2015) (Dennis, J., in chambers).

[48] 539 F. App'x at 529.

[49] *Id.* (citing *United States v. Silva*, 957 F.2d 157, 162 (5th Cir. 1992) and *Constante*, 544 F.3d 584, 585 (5th Cir. 2008)).

erred in applying the career offender guideline when sentencing St. Clair, because a conviction under Section 30.02(a)(3) is not a crime of violence.[50]

Following our precedent, we conclude that Section 30.02(a)(3) is not a crime of violence under the career offender guideline.[51]   The district court plainly erred by holding to the contrary.

Moving to the third prong of the plain error review, Presley's substantial rights were affected by the district court's erroneous application of the career offender guideline.   Without the enhancement, Presley's total offense level would have been 30 and his criminal history category would have been VI, thereby yielding an advisory sentencing guidelines range of 168-210 months of imprisonment—considerably less than the 360 month sentence the court imposed.   Because the district court would have likely imposed a lesser sentence without the career offender enhancement, we conclude that Presley's substantial rights are affected.

Finally, we hold that the potentially enhanced sentence seriously affected the fairness, integrity, or public reputation of judicial proceedings.

---

[50] 2015 WL 1611666 at *5.

[51] The Supreme Court recently struck down the ACCA's residual clause in *Johnson v. United States*, 192 L. Ed. 2d 569, 584 (U.S. 2015), holding that "imposing an increased sentence under the residual clause of the [ACCA] violates the Constitution's guarantee of due process."   The court struck down the ACCA's residual clause for unconstitutional vagueness. *Id.* at 579.   Our case law indicates that a defendant cannot bring a vagueness challenge against a Sentencing Guideline because a defendant is not entitled to notice of where within the statutory range the guideline sentence will fall. *United States v. Pearson*, 910 F.2d 221, 223 (5th Cir. 1990) (citing *United States v. Jones*, 905 F.2d 867 (5th Cir. 1990)).   Even if a defendant could bring a vagueness challenge to the career offender guideline's residual clause, this Court's precedent and our decision today, concluding that the guideline enhancement does not apply because Texas Penal Code § 30.02(a)(3) is not a crime of violence, is consistent with the Supreme Court's decision in *Johnson*.   The penalty enhancement does not apply.

No. 14-50406

## III.  CONCLUSION

For the reasons explained above, we affirm the conviction and sentence of Cornelius and Christopher.  We also affirm Presley's conviction, but vacate his sentence and remand the case to the district court for Presley to be resentenced.